**MUTUAL HOME & SAVINGS ASS'N.
v MERION, Supt.**

Ohio Appeals, 2nd Dist, Montgomery Co

No 1633.   Decided May 2, 1941.

Thomas J. Herbert, Attorney General, Columbus; D. C. Van Buren, Ass't. Attorney General, Columbus; S. S. Markham, Dayton; Rowan A. Greer, Jr., Dayton, of the firm of McMahon, Corwin, Landis & Markham; William P. Patterson, Special Counsel, Dayton, for Defendants-Appellants.

William G. Pickrel, Dayton; Philip C. Ebeling, Dayton, of the firm of Pickrel, Schaeffer & Ebeling, for Plaintiff-Appellee.

282.

## OPINION

By GEIGER, PJ.

This matter had its inception in the Court of Common Pleas of Montgomery County, Ohio. It is before us upon appeal on questions of law and fact.

The appeal is taken by virtue of the provisions of §687-22 and §12223-1 to 18 GC. and was from the finding of the Court filed on the 18th of January, 1940, declaring that the Superintendent of the Building & Loan Association had exceeded or abused his authority and discretion in issuing an order of June 6, 1939, finding that the liquidation of the Mutual Home & Savings Association was being improperly conducted and that the interests thereof were not being properly protected and in taking possession of the business and property of the Association under §687-1 GC.

The appellants claim the right to liquidate the assets of the Association by virtue of the fact that the Superintendent of the Building & Loan Association withdrew from the control of a group of directors the right to continue the liquidation and conferred such right, under statutory authority, upon the appellants, the state officials. Broadly, the appellants claim that the Superintendent had an undoubted right to so act and that there was no abuse of discretion. On the other hand, the appellees, the directors, claim that the action of the Superintendent was an abuse of discretion, as the appellees were conducting the affairs of the Association in a manner entirely proper and within the limits of statutory authority and that the Superintendent was without authority to deprive them of that control.

The case was bitterly contested and resulted in a Bill of Exceptions now presented to us containing more than four thousand pages, all of which we have read.

Counsel for appellants state the question before this Court as follows,.

"The question before the Court is 'Did Superintendent Merion exceed or abuse his power and discretion in finding that the liquidation of the Mutual under the directors was being improperly conducted, or that the interests in the liquidation were being improperly protected and in therefore taking possession of the business to complete the liquidation?'"

The first pleading is captioned, "Application for an Order of Injunction and Restoration" and was filed June 11, 1939. Its allegations are briefly, that prior to the 6th of June, 1939, the Association was operated under the provisions of §687-21 GC; that on the 6th of June, 1939, the defendant, Merion, as Superintendent, with the written approval of defendant, Jones, the Director of Commerce, took charge of all business and property of the Association for liquidation under the provisions of §687-1 GC; that the liquidation of said Association under §687-21 GC was being properly conducted and the interests of stockholders were being properly protected and that the Superintendent grossly exceeded and abused his power and discretion in the issuance of the order providing for the liquidation of the Association under the provisions of §687-1 GC. Plaintiff prays for an order of the Court directed to the Superintendent to show cause why such action for the liquidation under §687-1 GC should not be set aside and said Association restored to the rights previously enjoyed by virtue of §687-21 GC.

On motion, the Court ordered that Merion, Superintendent and Jones, Director of Commerce, show cause in the form of an answer on or before June 13, 1939, why their action should not be set aside and restoration made to the Mutual Home & Savings Association of the rights previously enjoyed.

In response to this order, the defendants, Merion, Superintendent of Building & Loan Associations and Jones, Director of Commerce, answered.

They deny that the liquidation of the Association under §687-21 GC was being properly conducted or that the interests of the stockholders therein were

being properly protected and deny that the State Officers have exceeded and abused their power and discretion.

The Superintendent sets out eighteen reasons why the liquidation was not being properly conducted.

The cause came on for hearing before the court below and on January 16, 1940, the court found that Charles S. Merion, Superintendent of Building & Loan Associations of Ohio **has exceeded or abused his power and discretion** in the issuance of the order of June 6. wherein he found that the liquidation of the Association was being improperly conducted or that its interests were not being properly protected and in taking possession of the business for complete liquidation pursuant to §687-1 GC and divesting the directors of the control of the Association. "It is by the court ordered, adjudged and decreed that the Superintendent or the Director of Commerce of Ohio be enjoined from further proceeding under the order of June 6, 1939, and from further action in liquidating the Association and it is ordered that the defendants restore to the Association all the rights and powers previously enjoyed under §687-21 GC."

We quote from the court's opinion:

"We come to the question at once as to whether or not the liquidation by the directors was proper or improper and whether or not the interests of the Mutual Home & Savings Association were being properly protected. This court is going to answer this question by saying that **it was proper liquidation and a good job was being done by the Directors, and that the interests of The Mutual Home & Savings Association were being protected.**"

## THE STATUTES

The several sections of the statutes which are involved in this litigation are included within the limits of §676 to 695 GC. To fully understand the matter the statutes must be read in detail.

Sec. 687-2 GC provides that the court may require the Superintendent to file a bill of particulars and if, upon the issues joined, the court finds that the bill of particulars is insufficient or that the Superintendent exceeded or abused his power and discretion, the court shall dismiss the liquidation proceedings and direct the Superintendent to surrender the property to the Association.

Sec. 687-10 GC enumerates the power of the Superintendent after taking possession.

The net result of these provisions is that the Building & Loan Associations of Ohio are constantly under the supervision of the Superintendent, who has plenary power to act at any time when he deems the interests of the stockholders and others have been put in jeopardy under any of the special grounds enumerated. However, the Superintendent is under the constant supervision of the court to which an appeal may be made by any association which deems itself aggrieved by the order made by the Superintendent. Upon issues made and the evidence. the court has authority to set aside the order of the Superintendent.

See **State ex Bettman, Attorney General v Court of Common Pleas, 124 Oh St 269.**

Secs. 687-21 and 687-21(a) GC definitely provide that the issuance of an order by the Superintendent shall terminate the power of the Association "to pay withdrawals of shareholders or depositors or to pay withdrawals of stock or stock credits".

## THE ESCROW

There is no provision in the statutes permitting an escrow agent to operate, but there has been the long time custom of the Superintendent of the Building & Loan Associations to permit this. The statutes are concerned with the **liquidation** of the Association under certain condition and payment of dividends to creditors and stockholders, or its continuance under the control of the directors, with the limited power in

reference to the distribution of its funds.

The essence of the escrow plan was that the purchaser of the Association's real estate or the mortgagor would agree to make a cash payment of a given amount accepted by the Association, not in its own name but on behalf of an "escrow agent", an individual or a bank. The escrow agent would use the cash for the purchase of stock on the market and these credits were accepted by the Association at par. As a result, although the actual negotiations were for cash, the Association received instead of the cash a greater par amount of stock credit and it was believed by the Superintendent that such device did not violate the statute.

As we have before stated, we find no statutory authority for these escrow agents. The duty of the statutory liquidating agency was to liquidate and not to make a favorable showing on the books. It did no one any good and could not result in a larger **dividend** to the stockholders than a straight payment of dividends as provided by the statute.

Regardless of the questionable legality of the so-called escrow plan, it is apparent that the take-over by the Superintendent can not be predicated solely upon the fact that escrowing was indulged in, since the plan was formulated by a Superintendent prior to 1933, who then suggested its use in the liquidation of Building & Loan Associations over the entire state, and subsequent superintendents, including the present, have sanctioned the continuance of the policy with certain limitations.

In the answer wherein the present superintendent sets out eighteen specified reasons why the liquidation was not being properly conducted he devotes seven to what might be designated as an abuse of the permitted plan of liquidation by the misuse of device of escrow.

Complaint is made that the directors used the device to an unwarranted extent and in a manner that did not inure to the benefit of distressed stockholders, but in fact permitted an abnormal market through which stockholders and others on the inside might speculate and obtain improper profits. The record discloses that contrary to the policy of the Superintendent, the Board of Directors, including the General Manager, were sold on the plan of escrowing beyong the maximum authorized by the Superintendent. The predecessor of the present Superintendent, under whom the present liquidating directors began operations and the present superintendent restricted the escrow plan within narrower limits than the activities of the Board of Directors.

Mr. Davidson, a resident of Dayton and a former bank clerk, was at the request of the liquidating Board, appointed as deputy superintendent. He was held in very high regard by the Board of Directors. Mr. Davidson was called as a witness by the state, and testifies that he was in continuous argument with the manager and president on the amount desired to be escrowed. He further testified that he had instructions from both superintendents to make the effort to procure more cash for dividends and less escrow, but not to stop the liquidation. He further testified that he conveyed this information to the manager and the officers: that he would quarrel with them and finally sign the escrow papers, since he could either do that or stop the liquidation.

## AN EXAMPLE OF THE OPERATION OF THE ESCROW.

An outstanding example of this situation and its results was in what was designated the James deal.

Lee Warren James, formerly a very prominent lawyer in the City of Dayton, now residing in New York City, in the early days of the Association was a director and its attorney. He secured a mortgage loan on a very valuable vacant lot on Main Street, Dayton, Ohio, in the sum of $440,000.00.

Aside from his real estate holdings, Mr. James had no other known assets.

Some time in 1938, while the present board was acting as liquidators, Mr. James presented a proposition of settlement through which an undisclosed third person would purchase the property for $220,000.00 cash, plus accrued delinquent taxes in the sum of something like $50,000.00, the same to be accepted in full settlement of his mortgage liability. It was the desire of the Board to escrow the entire amount. The Deputy Superintendent had advice from his superior that on large deals he did not have the authority to approve escrows but that the same should be referred direct to the Super-intendent. The Association sought the approval of the Superintendent to ac-cept the cash and immediately purchase stock therewith. They received advice from the Superintendent that this could not be done since the Association could not deal directly in their stock. However, he authorized the acceptance of the $220,000.00 as cash settlement, or if the purchaser or Mr. James would procure $440,000.00 of stock that the same would be approved in escrow. The purchaser was unwilling to go through with the deal on the plan of purchasing stock, for the reason that he would subject himself to a large income tax. The Association was unwilling to close the deal on a cash basis, and nothing further was done.

If the amount offered was a good sale under existing conditions, it should have been accepted on a cash basis. On the other hand, if the price offered was not the best sale price obtainable, it should not have been recommended at all. It would appear that the escrow plan in this instance, as insisted on by the Directors may have lost the Association a desirable settlement of an uncertain asset.

## OTHER EVILS

The record presents further evidence of certain evils that arose directly attributable to the excessive amount of escrowing. We ascertain from the record that stock did not normally come into the escrow agent as fast as the escrow funds went into his hands. This at once would present an unfortunate condition.

The stockholders generally had a perfect right to accumulate an inventory of stock at lower markets. We do not mean to criticize the action of the stockbrokers, but rather the plan, which brought about some undesirable results.

Another very grave evil which arose was that some time prior to June 23, 1938, the manager of the Association, Mr. Kelsey, (he was also a director) began to accumulate stock for his own use, buying the same under a fictitious name. Possibly none of the other eight directors knew of this activity of Mr. Kelsey, and all testified that they would not have approved it had they known of it. Mr. Kelsey finally sold his stock at the bottle neck period at a good profit, and at the request of the Board, resigned.

Much of the evidence in reference to transactions connected with escrowing of stock have disclosed activities which we can not consider as for the welfare or proper conduct of the business of liquidating the association.

For instance, there is evidence of transfers as follows:

Reiger Brothers, stockbrokers, on a certain day, might transfer to another broker. On the same day, the broker would transfer back to Reiger Brothers, and later on the same day, a transfer from Reiger Brothers to Reiger, escrow agent, all at advanced prices. When we consider all the evidence, the apparent purpose of these numerous transfers on the same day was in order that Reiger Brothers' profits would not be disclosed.

Considering the evidence in its entirety, as it refers to escrows, and the attending results, we are unable to determine that the Superintendent abused his discretion in taking over the institution for liquidation under §687-1 GC.

## FINAL ISSUE

Out of the pleadings, the mass of evidence and the briefs of counsel we arrive at the conclusion that the real issue in this case is whether or not

the Superintendent of Building & Loan Associations abused his discretion, when, on the 6th day of June, 1939, he took charge of the liquidation under the provisions of §687-1 GC. This issue is clearly made by the pleadings.

## ABUSE OF DISCRETION.

What constitutes an abuse of discretion by a court is well understood, but it is not so clear as to what may constitute such an abuse by a ministerial officer or commission.

In 32 O. Jur. P. 952, the matter is discussed and the general principles enunciated.

See the case of **State v Ferranto, 112 Oh St 667. State v Wright, 59 Oh Ap 191,** by this Court. **Hoffman v Knollman, 135 Oh St 170.**

The latest definition of abuse of discretion by a court by the Supreme Court of Ohio may be found in **Steiner v Custer, 137 Oh St 448:**

"The meaning of the term 'abuse of discretion' in relation to the granting of a motion for a new trial connotes more than an error of law or of judgment; it implies an unreasonable, arbitrary or unconscionable attitude on the part of the court."

In Words and Phrases, Permanent Edition, Volume 12, Page 587, et seq. may be found many other definitions as to abuse of discretion. Some of these apply to the exercise of discretion by public functionaries other than courts. Board of Commissioners v Lewis, 65 P. 51, 28 Colo. 378; Taylor v Robertson, 52 P. 1 Utah, 330.

"Discretion, applied to public functionaries, may be defined as the power or right conferred upon them by law of acting officially under certain circumstances according to the dictates of their own judgment and conscience, and not controlled by judgment or conscience of others."

Bank v Hayes, 171 N. W. 715, 186 Iowa, 892.

See Phinney v Montgomery, 257 N. W. 208, Iowa 1240; Farrelly v Cole, 56 P. 492, 60 Kan. 356; State v Tindell, 210 P. 619, 112 Kan. 256.

On request of the Association, examiners were sent from Columbus to the Dayton office by Mr. Merion who continued their examination for a considerable period. The directors seemed to appreciate the action of the Superintendent in sending them and expressed this on several occasions. We can not go into detail as to the result of the examination more than to say that Merion did not proceed arbitrarily but after due and cautious consideration of the affairs of the Association. It is true that in his investigation he did not make the escrow procedure a major cause for the taking over of the Association but over the course of six months between the first information in reference to its condition and the time it was taken over many things came to his attention which might properly be considered and influence him in reference to the proper action to be taken for the welfare of the Association.

It becomes our duty to examine the evidence to determine whether or not there has been an abuse of discretion.

We have cited the eighteen grounds asserted by the Superintendent to justify his action. From the eighth to the eighteenth specification, the grounds were that the members of the board were in constant dissention; that they failed to secure the consent of the Superintendent; failed to prevent the practice of having appraisers sign appraisal forms in blank; permitted fictitious appraisals; caused accommodation appraisals to be made; permitted appraisals to be made of property by those interested therein; permitted excessive insurance; failed to prevent collusive bidding; illegally authorized payment for services not performed; conducted the liquidation at excessive cost and finally the eighteenth ground. "For other errors apparent on the face of the record."

We have gone over all the evidence relating to these grounds and find that

some are not of serious consequence in the management of the liquidation. Nevertheless, they are proper to be considered by the Superintendent in determining whether or not he should continue the operation of the Association in the control of the board of directors rather than take it over as an officer of the state. Small matters which considered by themselves might not arouse strong opposition, yet a large number of acts may be done which if each merits criticism, the aggregate may well weigh heavily in the ultimate action of the Superintendent.

The first eight grounds relate largely to the policy and action of the Board in relation to escrowing. The extent to which escrowing took place is indicated by the fact that on May 7, 1938, at the inception of the operation by the directors, there was cash on hand in the sum of $831,410.00, that on June 6, 1939, there was $857,744.00 (with no distribution dividends paid) a cash increase of only $26,333.00 in a period of over a year. During this period, for the escrow operations the directors sanctioned the use of $413,694.00. Had no escrow purchases been made. the cash on June 6, 1939, would have been $1,274,439.00, or substantial dividends could have been paid.

On July 29, 1939, shortly after taking control on June 6th, Merion as Superintendent paid out approximately $450,000.00 as a dividend on the original $17,000,000.00 of outstanding stock. This dividend still left in the treasury of the Association a considerable amount of undistributed cash, the ultimate destination of which is properly into the pockets of the stockholders pro rata, each equal with the other. A further dividend has recently been paid.

## NO VIOLATION OF DISCRETION.

This brings us to the final distribution as to whether Merion, the defendant, violated his discretion by taking over the Association after he had discovered to what extent this process had been practiced and to what extent some of those connected with the Association may have profited by it.

We are not impressed with the claim that inasmuch as the escrow plan had been endorsed by prior superintendents that that would be an excuse for any of the directors liquidating an Association to use the plan to the extent it was used in this case, even though there may have been no attempt to secure a private profit.

Without burdening this opinion with further details, we arrive at the conclusion that the Association, the appellee, which deemed itself aggrieved by the order of the Superintendent has failed to show that the Superintendent in his take-over order abused the discretion reposed in him by the statute.

Arriving at this conclusion the order of the Court will be that the judgment of the court below be reversed and coming to enter the judgment that the court below should have entered, the petition will be dismissed.

BARNES and HORNBECK, JJ., concur.