746 P.2d 661

**STATE of New Mexico,**
**Plaintiff–Appellant,**

v.

**Hollis GRISSOM, W.W. Taylor, a/k/a "Doc" Taylor, Joe T. Boyd, a/k/a "Doc" Boyd, Defendants–Appellees.**

**Nos. 9552, 9562 and 9573.**

Court of Appeals of New Mexico.

Sept. 22, 1987.

Hal Stratton, Atty. Gen., Richard J. Klein, Fred C. Smith, Asst. Attys. Gen., Santa Fe, David W. Bonem, Dist. Atty., Clovis, for plaintiff-appellant.

Ray Twohig, Albuquerque, for defendant-appellee Grissom.

Michael E. Vigil, Albuquerque, for defendant-appellee Taylor.

Joe T. Boyd, pro se.

## OPINION

DONNELLY, Chief Judge.

The state appeals from three separate orders of the trial court dismissing criminal charges against defendants W.W. Taylor and Joe T. Boyd for alleged fraudulent practices, conspiracy and racketeering, and dismissing charges against defendant Hollis Grissom for alleged fraudulent practices. Because the appeals involve common issues, they have been consolidated for hearing before this court.

Two issues are presented on appeal: (1) whether the trial court erred in dismissing criminal charges arising out of the alleged violation of an emergency regulation promulgated by the New Mexico Savings and Loan supervisor; and (2) whether the trial court erred in dismissing a criminal information based upon a determination that defendants' rights to a speedy trial and due process of law were violated. We reverse.

Although this case has not yet reached trial, the appellate record is voluminous, exceeding 150 tape recordings of hearings and 17 volumes of transcript.

On November 2, 1983, the Curry County grand jury filed a criminal indictment against defendants Taylor and Boyd, charging them with fraud in excess of $20,000, embezzlement, securities fraud, conspiracy, and racketeering. Thereafter, on motion of defendants, on October 30, 1984, the trial court dismissed the charges, without prejudice, due to grand jury irregularities. A new complaint was filed on May 2, 1985 in the Curry County District Court, and by consent of the parties, venue was changed to Bernalillo County. Charges in the new complaint were similar to those contained in the prior indictment, but substituted Hollis Grissom for other named defendants and added charges of fraud involving State Savings and Loan Association of Clovis (State S & L). After a preliminary hearing, a criminal information was filed on March 26, 1986.

The charges against defendants involving State S & L arose out of the transfer to the institution of approximately $28 million dollars of negotiable instruments from Boyd, Taylor, and several corporate entities in which Boyd and Taylor were officers. Defendant Hollis Grissom was a former president of State S & L.

In late 1982, Snider Campbell, the New Mexico Savings and Loan supervisor, determined that State S & L was experiencing financial problems due in part to loans made by it and secured by collateral taken on timeshare investments. Campbell learned from a Federal Home Loan Bank Board audit of State S & L that approximately $1 million of the collateral held by State S & L on timeshares had become delinquent.

On May 16, 1983, acting under his emergency powers specified in NMSA 1978, Section 58-10-83, Campbell promulgated Emergency Regulation 83-3 (Regl. 83-3). The regulation became effective immediately and restricted the authority of state chartered savings and loan associations to purchase interests in timeshares or to fund

loans secured by collateral in timeshares. Defendants Hollis Grissom and W.W. Taylor were charged in Count 6 of the criminal information with violating Regl. 83–3 with intent to defraud, a felony under NMSA 1978, Section 58–10–95(B), between the dates of May 17 and October 13, 1983, and at a time when the investments were prohibited. State S & L subsequently became insolvent and was placed in receivership.

Grissom and Taylor filed a motion to dismiss Count 6, asserting that Regl. 83–3 was improperly promulgated and invalid. Taylor and Boyd also moved to dismiss the entire criminal information, arguing that delay in the prosecution violated their rights of due process and rights to a speedy trial.

After a hearing on the motions, the trial court dismissed Count 6 against Grissom and Taylor, finding that Regl. 83–3 was invalid. The trial court also dismissed with prejudice the criminal information against Boyd and Taylor, for violation of defendants' rights to a speedy trial and due process of law.

## I. EMERGENCY REGULATION

The trial court dismissed the charges against defendants Grissom and Taylor arising out of their alleged violation of Emergency Regulation 83–3. The court's dismissal was premised upon the alleged invalidity of the regulation and the supervisor's failure to specifically articulate in the regulation the factual basis for its promulgation.

Savings and loan associations chartered under New Mexico law are subject to regulation under the Savings and Loan Act. *See* NMSA 1978, §§ 58–10–1 to –111. Under the Act, the state savings and loan supervisor is empowered to adopt and enforce regulations governing the operation of saving and loan associations in order to maintain and preserve the solvency of the institutions. § 58–10–73.

Section 58–10–83 authorizes the issuance of emergency regulations, and provides in part:

Notwithstanding the procedures set forth in Sections * * * [58–10–72, 58–10–80 and 58–10–81 NMSA 1978] of this act, should the supervisor determine that an emergency exists which requires him to exercise, without delay, any of his powers granted under Sections [58–10–72, –80, and –81], he may issue, without notice, hearing or delay, any regulations or orders authorized by said sections * * * and require immediate compliance therewith.

Campbell testified that he learned in late 1982 that State S & L was experiencing extreme financial difficulties and the institution had made a large number of loans to Taylor secured by timeshare investments. Campbell stated that in March and April 1983, he learned from an audit of State S & L that an estimated $1 million of its $3 million timeshare securities was delinquent. Campbell stated that he also determined that some savings and loan associations in other states were experiencing serious financial problems with loans secured by timeshare collateral.

On May 16, 1983, Campbell, acting under his emergency powers, issued emergency Regl. 83–3, effective immediately, providing in part that:

(b) No [state savings & loan] association shall make, purchase or otherwise invest in any individual timeshare loan or contract.

(c) No association shall make, purchase or otherwise acquire an interest in any loan or evidence of indebtedness collateralized or secured by individual timeshare loans or contracts.

Campbell held a hearing on the regulation within the ten-day period required under Section 58–10–83. After the hearing, he ordered that the prohibition against timeshare investments be continued pending the issuance of a permanent regulation. On October 13, 1983, Campbell adopted Regl. 83–8, which contained findings of fact and conclusions of law. This regulation also established criteria upon which state chartered savings and loan associations could make loans secured by interests in timeshares.

Following a hearing on defendants' motion to dismiss Count 6, the trial court held that Regl. 83–3 was void, finding that it precluded associations from making loans secured by an interest in real estate contrary to authority given to such institutions by the legislature, and because Campbell failed to adequately state the factual basis for the issuance of the regulation.

 Statutes providing for regulation and supervision of savings and loan associations have been upheld under the state's general police powers. *Mechanic's Bldg. & Loan Ass'n v. Coffman*, 110 Ark. 269, 162 S.W. 1090 (1913); *Richardson v. Superior Court*, 138 Cal.App. 389, 32 P.2d 405 (1934); *Krimke v. Guarantee Bldg. & Loan Ass'n*, 112 N.J.L. 317, 170 A. 637 (1934); *Jefco, Inc. v. Lewis*, 520 S.W.2d 915 (Tex.1975). Savings and loan associations are closely affected with the public interest. *Brazosport Sav. & Loan Ass'n v. American Sav. & Loan Ass'n.*, 161 Tex. 543, 342 S.W.2d 747 (1961). The statutory powers authorizing a state to regulate state chartered banks and savings and loan associations are similar in nature. *See North Am. Bldg. & Loan Ass'n v. Richardson*, 6 Cal.2d 90, 56 P.2d 1221 (1936); *State v. Merrill*, 83 Wash. 8, 144 P. 925 (1914). Because savings and loan associations are closely affected with the public interest, the state, under its police power, may assert supervisory and regulatory authority beyond that generally applicable to corporations. *See Union Sav. & Inv. Co. v. District Court*, 44 Utah 397, 140 P. 221 (1914).

Defendants do not challenge the authority of the supervisor to issue emergency regulations, but contend that an emergency did not actually exist at the time Regl. 83–3 was adopted, that the justification contained in the regulation was in part unsubstantiated, and that the basis for the issuance of the regulation was not adequately set forth in the regulation. We disagree.

Section 58–10–83 authorizes the supervisor to issue an emergency regulation upon determination that an emergency exists. As required by statute a hearing was held within ten days from the issuance of the regulation and findings of fact were subsequently adopted, determining that "an absolute prohibition against making timeshare loans was not required.... [and that] it was necessary to develop certain criteria and standards by which associations would be required to abide ... in making timeshare loans." § 58–10–83.

 Defendants contend that the provisions of the Administrative Procedures Act, NMSA 1978, § 12–8–4(B), require that the basis for the agency action be set forth in writing prior to the promulgation of an emergency rule. The Administrative Procedures Act does not apply to the Savings and Loan Act. *See Mayer v. Public Employees Retirement Bd.*, 81 N.M. 64, 463 P.2d 40 (Ct.App.1970). Moreover, the recitation of facts contained in the emergency regulation set forth grounds indicating the existence of serious financial problems involving timeshare loans and provided a sufficient basis for the issuance of the regulation.

 Defendants also assert that the emergency regulation prevented state savings and loan institutions from dealing in timeshares, was overly broad in its scope, and that it was contrary to the Savings and Loan Act, which expressly permits associations to make loans on real property. We disagree.

The legislature, in enacting Section 58–10–83, specifically empowered the supervisor to adopt emergency regulations subject to the requirement that a hearing thereon be held within ten days. Under the Savings and Loan Act, a supervisor may exercise discretionary emergency powers where an emergency is determined to exist endangering the solvency of state chartered savings and loan associations. *Cf. Mutual Home & Sav. Ass'n v. Merion*, 67 Ohio App. 439, 37 N.E.2d 109 (1941). The testimony of Campbell and the record supports his decision to issue the emergency regulation.

 Defendants also argue that the supervisor's emergency regulation sought to restrict state chartered savings and loan

associations from making loans on time-shares at a time when similar loans were authorized by institutions chartered by the federal government. This restriction does not invalidate the regulation. The regulatory provisions of the state and federal government need not be identical or in agreement with each other. *Cf.* § 58–10–50.

We have examined each of defendants' contentions marshalled under this point and find they are without merit. The trial court erred in dismissing the charges contained in Count 6 of the information against Grissom and Taylor.

## II. SPEEDY TRIAL REQUIREMENT

The state contends the trial court erred in dismissing the criminal information for want of speedy trial. The pertinent dates affecting the ruling of the trial court are as follows:

November 2, 1983: initial indictment filed against defendants Taylor and Boyd.

Oct. 30, 1984: charges dismissed without prejudice.

May 2, 1985: criminal complaint filed against defendants Taylor, Boyd and Grissom.

May 24, 1985: preliminary hearing date set for July 11, 1985.

June 12, 1985: Taylor moves to disqualify judge and moves to dismiss complaint for delay.

June 17, 1985: Boyd joins Taylor's motion to dismiss for delay.

July 9, 1985: Boyd files affidavit to disqualify judge (different from Taylor's motion to disqualify).

July 11, 1985: judge recuses and, in response to Boyd's request, a second judge voluntarily recuses.

July 30, 1985: Judge Blackhurst designated as judge.

Oct. 1–4, 7–11, 1985

Dec. 2–5, 1985: preliminary hearing held.

January 25, 1986: final briefs filed by all defendants and state.

March 6, 1986: court enters bind overs.

March 25, 1986: state files criminal information.

April 11, 1986: arraignment, trial scheduled for August 1, 1986.

June 2, 1986: Boyd and Taylor file motions to dismiss for delay.

August 7, 1986: motion hearing commences.

August 25, 1986: court announces decision and enters findings requiring dismissal.

Sept. 19, 1986: order dismissing information filed.

Whether or not prejudice from delay exists must be determined from the circumstances of the particular case. *State v. Lucero,* 91 N.M. 26, 569 P.2d 952 (Ct.App. 1977). In *State v. Kilpatrick,* 104 N.M. 441, 722 P.2d 692 (Ct.App.1986), this court applied the factors articulated in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), to determine whether a defendant's rights to a speedy trial under the sixth amendment had been prejudiced. Under *Barker,* the four basic factors employed to analyze the effect of delay are: (1) the length of the delay; (2) the reason for the delay; (3) defendant's assertion of the right; and (4) the prejudice, if any, resulting to defendant.

The trial court adopted findings of fact and conclusions of law, holding, among other things, that: (1) the *Barker* factors apply to the period from the filing of the indictment to the conclusion of the hearing, a thirty-four month period; (2) the charges against defendants, although numerous, and involving a large quantity of documents, were not overly complex; (3) the period between the dismissal of the indictment and the filing of the criminal complaint was inadequately explained by the state and constituted improper delay attributable to the state; (4) the period from the filing of the complaint to the conclusion of the hearing was presumptively prejudicial; (5) defendants had invoked their rights to a speedy trial; and (6) the state, after filing the complaint, also requested a speedy trial and had taken no action to delay the preliminary hearing. The court also concluded that:

[T]he defendants have been prejudiced in their ability to produce exculpatory evidence; the memories of witnesses have been seriously impaired; defendants have been subjected to public obloquy and creation of anxieties, diminution of health, loss of assets and income. That the Fifth and Sixth Amendment Rights of the defendants under the United States Constitution and their Article 2, Section 14 [rights] of the New Mexico Constitution have been violated.

The state challenges the trial court's findings and orders of dismissal, asserting that much of the delay was due to the number of motions filed by defendants, disqualification of judges by defendants, delay in designating a new judge to preside over the cases, the length of the preliminary hearing, and due to requests by defendants for continuances. The state also argues that the trial court erred in including in its speedy trial analysis the entire thirty-four-month period from November 2, 1983 (the filing of the indictment), to the hearing on defendants' motion to dismiss, and inclusion of the period between dismissal of the initial indictment and filing of the new criminal complaint.

■ The trial court found the thirty-four-month delay in the present case was presumptively prejudicial, thus triggering the application of the balancing factors set out in *Barker v. Wingo.* Even though a *Barker* analysis necessarily involves an evaluation of the underlying facts in the case, whether the constitutional right to a speedy trial has been violated is an issue of law. *Jones v. Morris,* 590 F.2d 684 (7th Cir.1979); *see also Cain v. Smith,* 686 F.2d 374 (6th Cir.1982).

On appeal, a reviewing court is required to independently balance the factors considered by the trial court to determine whether a defendant has been deprived of his constitutional right to a speedy trial. *See United States v. Loud Hawk,* 474 U.S. 302, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986); *Barker v. Wingo; see also State v. Kilpatrick.*

**(a) *Length of Delay***

[6] The sixth amendment speedy trial guarantee does not attach until a defendant is indicted, arrested or accused. *United States v. MacDonald,* 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982); *United States v. Jenkins,* 701 F.2d 850 (10th Cir. 1983). *See also State v. Tafoya,* 91 N.M. 121, 570 P.2d 1148 (Ct.App.1977), *modified,* 103 N.M. 52, 702 P.2d 997 (1985). Similarly, the time during which an indictment is dismissed should not be considered under a speedy trial analysis where defendants are free of restrictions on their liberty. *United States v. Loud Hawk; cf. State v. McCrary,* 100 N.M. 671, 675 P.2d 120 (1984). In both pre-indictment and post-dismissal periods, any undue delay must be tested under the Due Process Clause and not the Speedy Trial Clause. *United States v. MacDonald; see generally United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *State v. Jojola,* 89 N.M. 489, 553 P.2d 1296 (Ct.App.1976).

Contrary to the trial court's conclusion, the speedy trial balancing factors do not apply to the entire thirty-four-month period. In *Arnold v. McCarthy,* 566 F.2d 1377, 1382 (9th Cir.1978), a reviewing court analyzed analogous delay periods, stating:

> After a normal investigation and prosecution of the case to trial, a mistrial and dismissal occurred. Then the process repeated itself, resulting in further investigation and a new trial, this time ending with a guilty verdict. [Defendant] asks us to lump together the delay incurred by him during his two trials and test the whole period under the stricter speedy trial standards. This we cannot do.

■ A presumptively prejudicial delay must exist before the reason for delay, assertion of the right, and prejudice to defendant may be evaluated. *State v. Santillanes,* 98 N.M. 448, 649 P.2d 516 (Ct. App.1982); *State v. Tafoya.* This case presents allegations of white collar criminal activity involving several defendants, multiple transactions involving large sums of money, and therefore necessitates an increased tolerance for delay. *See Barker v. Wingo; State v. Kilpatrick.* We deter-

mine, however, that the almost sixteen-month period following the filing of the criminal complaint is presumptively prejudicial, necessitating the complete *Barker* analysis. The balancing of the *Barker* factors applies to the sixteen-month period extending from the date of the criminal complaint to the date the court announced dismissal, and not the interval between dismissal of the original indictment and the filing of the subsequent criminal complaint.

#### (b) *Reasons for Delay*

Delay arising from hearing defendants' motions, not caused by the prosecution, is weighed against the defendant in balancing the *Barker* factors. *State v. Harvey*, 85 N.M. 214, 510 P.2d 1085 (Ct.App.1973); *State v. Mascarenas*, 84 N.M. 153, 500 P.2d 438 (Ct.App.1972). *See also Raburn v. Nash*, 78 N.M. 385, 431 P.2d 874 (1967). "A defendant cannot both file a motion which requires a 'slow down in the judicial process so as to delay his trial,' * * * and escape responsibility for the delay by making a perfunctory objection for the record." *People v. Manna*, 96 Ill.App.3d 506, 513, 51 Ill.Dec. 907, 912, 421 N.E.2d 542, 547 (1981).

After the criminal complaint was filed, Taylor moved to disqualify District Judge Reuben Nieves from presiding at the preliminary hearing scheduled to begin July 11, 1985. Similarly, Boyd filed an affidavit on July 9, 1985, for the disqualification of Judge Fred T. Hensley. The state requested that the supreme court appoint a new judge. On July 30, 1985, Judge H. Richard Blackhurst was designated. On August 3, 1985, prosecutors requested that the court conduct a speedy preliminary examination. On August 25, 1985, Judge Blackhurst returned from the Judicial College and scheduled a preliminary hearing which extended over a four-day period in early October. After the prosecution rested, defendants requested a week of court time in order to call ten to fifteen witnesses. The court scheduled the first available week, December 2 through 5, 1985, at which time defendants called only three witnesses and rested on the first day.

Due to the volume and complexity of the evidence, the trial court, with the consent of all parties, established a written briefing schedule. Thereafter, bindover orders were entered on March 6, 1986. The state filed a criminal information on March 27, 1986; arraignment occurred on April 11, 1986; trial was set for August 1, 1986; and motion hearings on defendants' motions to dismiss were scheduled for July 30 and 31, 1986, and then continued at defendants' request. Defense counsel advised the court that they were unable to attend these hearing dates due to an ongoing jury trial in another court, and the court again continued the motion hearings until August 8, 1986. Thus, it appears that after the filing of the criminal complaint, most of the delay was caused by the actions of the defendants.

Delay during the period between May 2, 1985 and August 25, 1986 (an interval of over fifteen months), was caused primarily through a combination of defendants' motions, state's responses to these motions, and the court's attempt to accommodate defendants' requests for court time and defense counsels' prior commitments. Under these circumstances, primary responsibility for any delay should not be weighed against the state.

#### (c) *Assertion of the Right*

We next consider defendants' assertion of their rights to a speedy trial. Although the primary burden is placed upon courts and prosecutors to bring cases to trial, a defendant has a responsibility to render a timely assertion of his right to a speedy trial. *Barker v. Wingo; State v. Kilpatrick.* This demand is then balanced against any prejudice resulting to the defendant, in addition to evaluation of the length and reason for delay. *Barker v. Wingo.* Taylor filed motions to dismiss for lack of speedy trial in September 1985 and June 1986. Taylor also filed a motion to dismiss for lack of a timely preliminary hearing in June 1985. Boyd filed a motion to dismiss for lack of speedy trial in June 1986, and also joined in Taylor's June 1985 challenge to the preliminary hearing. By

reason of these motions, defendants properly asserted their rights to speedy trial. *Cf. United States v. Loud Hawk.*

### (d) *Prejudice to Defendants*

Defendants contend they suffered prejudice resulting from the state's delay in the prosecution. In addition to the period between the complaint and dismissal, Taylor and Boyd assert, in connection with their claim of denial of speedy trial, that prejudice accrued both during pre-indictment periods and from the time of indictment to dismissal. During the period prior to the original indictment, and extending to the date of the dismissal of the subsequent criminal complaint, defendants argue prejudice resulted from a number of factors. We examine these contentions seriatim.

### (1) *Death of Adkisson*

■ Defendants argue that they were prejudiced by their inability to produce exculpatory evidence resulting from the death of a witness, Jerry Adkisson, on October 16, 1983. The speedy trial guarantee, however, does not apply to the loss of Adkisson's testimony because the record indicates his death occurred during the pre-indictment period. *See United States v. MacDonald.*

### (2) *Loss of Documents*

Defendants also argue they were prejudiced through the destruction of documents in the fire of Jack Brown's residence in August 1984. The *Barker* analysis does not call for balancing where the length of delay is not presumptively prejudicial. The fire occurred during the period following the filing of the indictment and at a time when there was no presumption of prejudicial delay.

### (3) *Nance's Death*

The charges in the information against Boyd relating to Nance's value as a witness concerned Boyd's role in transferring Royal Aloha Vacation Club (Royal Aloha) promissory notes through Credit Plan Corporation (Credit Plan), to State S & L in excess of their value.[1] The trial court stated in its findings of fact that Nance, as an officer and part-owner of Credit Plan, was an experienced banker and a material and indispensable witness who would have testified that he: investigated Credit Plan before becoming involved in it; visited the timeshare projects associated with Royal Aloha; did not forge the timeshare notes but studied the notes, flow of money and sales procedure of Royal Aloha; and believed the notes were financially sound.

The record indicates, however, that in a deposition given by Boyd and admitted into evidence for impeachment purposes, Boyd testified that Nance was totally unfamiliar with transactions relating to the Royal Aloha notes and that Nance was only briefly affiliated with Credit Plan for a period of approximately thirty days. The state argues that Nance's value as a defense witness was subject to impeachment due to his prior statement to the Curry County District Attorney's office (upon receiving a target notice from the grand jury) that he did not know anything about Royal Aloha or Credit Plan and that the entities only used his name.

The state also contends that any testimony Nance might have given concerning the value of notes as investments for a savings and loan, would have been subject to impeachment by reason of a competing claim for possession and prior lien against the notes, and evidence that he was a bankrupt. Nance's counsel, Phillip Gaddy, also testified at the motion hearing that if Nance had been called to testify at trial, Gaddy would have been present and would have advised Nance of his fifth amendment privileges. Finally, the state contends that Boyd had available as witnesses Randolph Shipley, his attorney at Royal Aloha Associates, and Jack Brown, who operated Royal Aloha and who had testified as a defense witness at the hearing.

---

**1.** Because of the nature of the charges in the complaint, the trial court's findings, and the adoption of arguments by defendants Boyd and Taylor, this portion of the analysis applies to Taylor as well.

Although the trial court found that Nance would have been a material and indispensable witness, review of the record also indicates that the value of Nance's testimony was succeptible to possible impeachment by cross-examination. Impairment of the value of a witness's testimony is a factor to be considered in balancing claims of prejudice. *Cf. Arnold v. McCarthy.*

### (4) *Destruction of Documents*

The trial court found that after Nance's death, Boyd attempted to locate Nance's personal files relating to the Royal Aloha transactions from the estate without success. Phillip Gaddy testified that in June 1986, his office destroyed certain Nance files. Boyd argues these files allegedly contained exculpatory material. The destruction of this material occurred a year after the complaint was filed. The responsibility for initiating efforts to discover or obtain evidence of which defendants were aware rests with defendants. *Cf. United States v. Edwards,* 577 F.2d 883 (5th Cir. 1978); *United States v. Netterville,* 553 F.2d 903 (5th Cir.1977).

### (5) *Memory Loss of Witnesses*

The trial court found that witness Tom Lee suffered memory loss concerning the issuance of default insurance on timeshare contracts to Taylor's corporation as a result of unintentionally taking medication prescribed for someone else. The court also found that witnesses Art Outhier and Robert Swinford suffered physical health problems, and due to delay, Boyd's ability to present exculpatory information concerning terms and payments on solar notes was impaired.

Taylor offers only general assertions of prejudice on this point, contending, without explanation, that the memories of these witnesses had deteriorated and concerned matters that were alleged to be material and exculpatory. Defendants have not presented specifics corroborative of this contention. Unspecified allegations of an impaired defense are unpersuasive. *United States v. Jenkins; United States v.*

*Edwards. See also State v. Lucero.* Diminished memory claims are subject to careful scrutiny as to their impact on a particular case. *See United States v. Juarez,* 561 F.2d 65 (7th Cir.1977).

The trial court found that Lee had no present memory of whether Taylor told Lee of Taylor's prior felony conviction in connection with the insurance application. (The five million dollar fidelity bond was acquired without disclosing Taylor's prior felony on the application.) It therefore appears that at trial, the state would also be prejudiced through the absence of this direct evidence in its attempts to establish that Taylor defrauded Lee. Further, the effect of the impaired memories of Outhier and Swinford were mooted when the charges to which their knowledge related were dismissed after the preliminary examination. *See United States v. Avalos,* 541 F.2d 1100 (5th Cir.1976) (faded memories not substantially related to any material fact in issue do not unfairly prejudice defense).

### (6) *Claim of Miscellaneous Prejudice*

Defendants also claim prejudice in the form of stress, anxiety and impairment of health; destruction of Taylor's ability to deal as a customer of financial institutions; Boyd's loss in chiropractic practice and other business interests; excessive legal costs; widespread media attention; and, Taylor's inability to show the source of the material alteration to a three-and-a-half million dollar collateral note signed by Taylor in favor of State S & L, which was in custody of the state and federal regulator and investigator.

While it is clear that defendants were subjected to emotional pressures arising out of the charges against them, the record does not suggest emotional or physical stress experienced by defendants exceeding that attending most criminal prosecutions. Defendants were not incarcerated pending trial. *See United States v. Netterville; see also United States v. Simmons,* 536 F.2d 827 (9th Cir.1976) (where defendant was at liberty on own recognizance, conclusory allegations of general anxiety

constituted minimal prejudice and, without more, did not deprive defendant of speedy trial). The record indicates that other factors exist which also may have contributed to Taylor's difficulty in carrying on business with other financial institutions during this period, e.g., prior felony conviction and unrelated history of litigation. Finally, the trial court's finding that Taylor was prejudiced in not being able to show the source of an alteration to a particular note is not supported by substantial evidence. The record does not indicate that the instrument was a timeshare note involved in the alleged fraudulent sales to State S & L, nor does the record indicate how delay occasioned the prejudice or how the alteration is relevant to any defense.

We have considered each of the assertions of prejudice relied upon by defendants. In balancing each of defendants' claims of prejudice against the reasons for delay against the applicable time periods involved, we determine that considered in their entirety, the delays attributable to the state did not substantially prejudice defendants' rights to a speedy trial.

## III. DUE PROCESS REQUIREMENT

■ Defendants Taylor and Boyd also contend the charges against them should be dismissed by reason of delay resulting in denial of their constitutional due process rights. Because defendants' due process claims must be considered separate and apart from their claims of denial of speedy trial, we analyze these claims independently. In *State v. Duran*, 91 N.M. 756, 581 P.2d 19 (1978), the supreme court recognized the analysis adopted in *State v. Jojola*, as applicable to claims of denial of due process based on alleged prosecutorial delay. *Jojola* held that showing of substantial prejudice must be established before a defendant may obtain a dismissal based upon a pre-indictment delay. Defendant initially has the burden of demonstrating "actual" prejudice by specifically establishing how his defense would have been more successful had the delay been shorter. *State v. Duran.*

Where there has been a showing of actual prejudice, the court must then balance the prosecution's conduct against actual prejudice ensuing to defendant to determine if these factors amount to "substantial" prejudice to defendant. *Id.; cf. United States v. Marion; United States v. Jenkins* (defendant must establish that the delay was purposefully caused by the prosecution to obtain tactical advantage or to harass). Evidence of delay does not, without more, indicate actual prejudice, nor constitute substantial prejudice. *State v. Duran.*

In reviewing defendants' due process contentions on appeal, we are required to conduct an independent review of the record and the law. *See State v. Duran; State v. Padilla*, 91 N.M. 800, 581 P.2d 1295 (Ct.App.1978); *see also Worker's Compensation Rating and Inspection Bureau v. Commissioner of Ins.*, 391 Mass. 238, 461 N.E.2d 1178 (1984).

### (a) *Pre-indictment Delay*

■ Defendants claim prejudice in the pre-indictment period stemming from the death of Jerry Adkisson on October 16, 1983, three days before the grand jury began hearing evidence. Defendants contend Adkisson would have testified that he arranged for a fidelity bond to be issued to Southwest Mortgage Service Corporation, which insured the notes sold to State S & L against default by the debtors. Defendants accordingly argue that this particular proof of insurance was material and exculpatory because it could have demonstrated that State S & L would not lose money in buying the timeshare notes.

Defendants have not, however, demonstrated how their defense would have been more successful had the delay been shorter. Nor have defendants explained whether other witnesses could have offered substantially similar testimony or whether other documentary proof of the alleged insurance transaction was available. The record indicates that the state agreed to stipulate the admissibility of previous sworn testimony by Adkisson presented in June 1983, as Taylor's witness in a Federal Home Loan

Bank Board proceeding concerning transactions between Taylor and State S & L. The hearing was in connection with a Federal Savings and Loan Insurance Corporation order prohibiting Taylor from engaging in the affairs of State S & L. *See Arnold v. McCarthy* (prejudice from death of witness not substantial where delay did not result in lost evidence because defendant had right to introduce record from two preliminary hearings where victim testified). Defendants have not indicated why they could not utilize this prior sworn testimony.

### (b) *Period Between Dismissal and Filing Complaint*

Defendants claim that the six-month delay in filing the criminal complaint after the grand jury indictment was dismissed gives rise to a due process violation because of prejudice resulting from the death of Nance. Because a claim of prejudice attributable to the period after charges are dismissed is also evaluated under the due process clause, we apply the *Duran* analysis to this post-dismissal period. *See also United States v. MacDonald.*

Nance's death occurred twenty-three days after the complaint was filed; hence, his death falls within the speedy-trial sequence, and prejudice from the witness's death is properly discussed under both speedy trial and due process frameworks. Defendants emphasize, as indicated in our speedy trial discussion, exculpatory matters which the trial court found Nance may have been able to testify about as a witness. Although the trial court found Nance would have been a credible and persuasive witness, there is no indication that Nance's testimony was the only substantial evidence supporting the soundness of time-share notes or that had the complaint even been filed within less than six months of the dismissal of the indictment, Nance would have been able to testify. The death of a witness shortly after the filing of criminal charges, without more, does not constitute a basis for dismissal of charges. Defendants have failed to establish with

specificity the critical testimony which they assert has been lost or whether this evidence is available from other sources. *State v. Lucero.*

Defendants also contend that the memory losses of witnesses Tom Lee, Art Outhier, and Robert Swinford demonstrates actual prejudice attributable to this six-month period. For reasons discussed in our speedy trial analysis, we determine that, considered as a whole, the responsibility for any prejudice suffered by defendants concerning these witnesses cannot primarily be ascribed to the state. *Cf. United States v. Villa,* 470 F.Supp. 315 (N.D.N.Y. 1979) (diminished recollections are not the type of actual prejudice required by *United States v. Marion*). Defendants have not established actual prejudice resulting from the deaths of Adkisson or Nance.

### CONCLUSION

When each of the factors cited by defendants are considered, we determine that the trial court erred in dismissing the charges. Significantly, the trial court improperly included in its analysis of the speedy trial delay, the period between dismissal of the initial indictment and the time of the filing the second complaint. Additionally, the record indicates that a substantial portion of the delay of the proceedings herein resulted from actions of the defendants themselves.

The trial court's orders dismissing Count 6 of the criminal complaint against defendants Grissom and Taylor and the order dismissing the criminal complaint against defendants Taylor and Boyd are reversed.

IT IS SO ORDERED.

ALARID and APODACA, JJ., concur.