# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2019-NMCA-056**

**Filing Date: May 23, 2019**

**No. A-1-CA-35812**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**SAMMY GARCIA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY**
**Louis P. McDonald, District Judge**

Certiorari Denied, September 10, 2019, No. S-1-SC-37766. Released for Publication October 29, 2019.

Hector H. Balderas, Attorney General
Santa Fe, NM
M. Victoria Wilson, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
C. David Henderson, Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**VARGAS, Judge.**

**{1}** Defendant appeals his convictions for one count each of child abuse, kidnapping, contributing to the delinquency of a minor, and battery against a household member, as well as two counts of bribery of a witness and four counts of conspiracy. Defendant raises five claims of error: (1) that an expert witness's bolstering testimony amounted to plain error; (2) that there was insufficient evidence to support his convictions; (3) that his

conspiracy convictions violate his right to be free from double jeopardy; (4) that he was denied his right to a speedy trial; and (5) that the delay in resolving his appeal violated his due process rights. We conclude that the expert witness's bolstering testimony constitutes plain error, that insufficient evidence exists to support one of Defendant's convictions for bribery of a witness, and that three of Defendant's conspiracy convictions violate double jeopardy. We otherwise find the evidence sufficient to support Defendant's remaining convictions. We conclude that Defendant failed to preserve his speedy trial argument for appellate review, and decline to review that claim for fundamental error. Finally, with respect to Defendant's due process argument, an issue of first impression in this state, we hold that New Mexico recognizes a due process right in the timely resolution of an appeal of right, but conclude, on the record before us, that Defendant failed to make the required showing of prejudice to warrant relief on due process grounds.

**FACTUAL BACKGROUND**

**{2}**     Victim went to her grandparents' house on Thanksgiving Day in 2003, where many of her family members, including Defendant, Victim's uncle, were gathered. According to Victim's testimony, she was playing outside with a go-cart when a flat tire caused her to enter a shed on the property in search of an air pump. Once inside the shed she encountered Defendant, who grabbed her, threw her onto the floor, held her down, and sexually assaulted her. During the encounter, Defendant's son entered the shed and Defendant held Victim down while Defendant's son sexually assaulted her. Victim was eventually allowed to leave the shed, and subsequently reported the incident to authorities.

**{3}**     Defendant was indicted on twelve counts: one count each of child abuse, kidnapping, contributing to the delinquency of a minor, and battery against a household member, two counts of bribery of a witness,[1] four counts of conspiracy, and two counts of criminal sexual penetration of a minor (CSPM). The jury could not reach a verdict on the CSPM charges, but convicted Defendant of the remaining counts; the district court declared a mistrial on the CSPM charges. The State apparently elected not to retry Defendant on the CSPM charges. Defendant received the basic sentence for each conviction, resulting in a total sentence of thirty-five and one-half years, with seventeen and one-half years suspended.

**APPELLATE PROCEDURAL BACKGROUND**

**{4}**     Defendant's trial counsel timely filed a notice of appeal on October 26, 2005, and a docketing statement on December 27, 2005. The case was assigned to this Court's general calendar on February 9, 2006, but when no brief in chief was filed, this Court, on its own motion and in accordance with the rules of appellate procedure, issued an

---

[1]While Defendant's indictment refers to Count VIII as a claim for "Bribery of a Witness (Threats-Testimony)," the verdict refers to Count VIII as "Intimidation or Threatening a Witness." We will therefore refer to Count VIII as a claim for intimidation and threatening a witness.

order on May 23, 2006, dismissing the appeal but giving counsel leave to file a motion for rehearing within fifteen days. No such rehearing motion was ever filed.

{5}    Nearly eight years later, on March 11, 2014, Defendant, filed a habeas petition in the state district court, and through appointed counsel, asserted ineffective assistance of counsel on appeal. Defendant's habeas petition requested that he be granted the right to file a new notice of appeal, as well as the right to file the original docketing statement under a new appellate case number, and that the appellate division of the public defender be appointed to represent him on appeal. Defendant did not assert any due process claim in his habeas petition. On September 2, 2015, the habeas court found that Defendant had demonstrated ineffective assistance of appellate counsel and granted Defendant's requested relief. The notice of appeal was filed on October 8, 2015, but apparently due to confusion arising from the habeas court's order, a docketing statement was not filed in this Court until August 16, 2016, along with a motion seeking clarification regarding reinstatement as provided by the habeas court's order. Defense counsel submitted the same docketing statement that was originally submitted with the first notice of appeal; this Court declined to "reinstate" the first appeal, but accepted the original docketing statement under the present case number. After seven extensions of time, Defendant's brief in chief was finally filed on July 21, 2017, and the case was submitted to a panel on May 1, 2018. In November 2018 we requested that our Supreme Court accept certification of this case, given the issue of first impression raised in this appeal. The Supreme Court denied our request in January 2019 and we held oral argument in February 2019.

{6}    We reserve further discussion of the facts for our analysis below.

**DISCUSSION**

{7}    Our analysis begins with Defendant's assertion that under the plain error doctrine, he is entitled to a new trial. Because we conclude Defendant is entitled to a new trial on this ground, we consider whether there is sufficient evidence to support Defendant's convictions to determine whether retrial would implicate double jeopardy protections. In the interest of brevity, we combine our analysis of double jeopardy and legal sufficiency with respect to Defendant's conspiracy convictions. Following our sufficiency analysis, we briefly turn to Defendant's speedy trial argument before considering whether appellate delay violates a criminal defendant's right to due process, the parameters of such a due process analysis, and whether Defendant's due process rights were violated in this case.

**A.    Improperly Admitted Expert Opinion Testimony Was Not Harmless Error**

{8}    Defendant argues that testimony presented at trial by Rosalia Vialpando, a registered nurse, improperly bolstered Victim's testimony and vouched for Victim's credibility, resulting in plain error that requires reversal. The State concedes that portions of the nurse's testimony were inadmissible, but argues that the admission of those portions does not constitute plain error. The parties also disagree as to whether

Defendant preserved this issue, allowing for a reversible error analysis, or failed to preserve it, requiring a plain error analysis. Because we determine that the admission of Vialpando's testimony rose to the level of plain error requiring reversal, we need not address whether the issue was properly preserved.

## 1.      The Expert's Testimony

**{9}**      At trial, Vialpando testified on behalf of the State as an "expert family nurse practitioner with a specialty in child sexual abuse." Defense counsel did not object to the qualification of Vialpando as an expert witness. Vialpando testified about Victim's account of sexual assault at length, repeating many of Victim's statements, and further testified that Victim had identified Defendant and Defendant's son as the individuals who committed the assault. Based on Victim's account of events, Vialpando concluded that "the things that [Victim] said had happened to her had, in fact, happened to her" and that Victim's physical examination, which revealed no physical injuries to Victim's genital area, was consistent with her description of the incident. Defense counsel made no objection to Vialpando's testimony. On cross-examination, defense counsel asked Vialpando questions about what Victim told her and raised issues attempting to draw into question Vialpando's conclusion that Victim had been raped. During redirect, Vialpando was asked to explain what aspects of Victim's account were most "compelling." Defense counsel objected to this line of inquiry, arguing it was beyond the scope of cross-examination; counsel's objection was overruled. Vialpando then went on to provide a lengthy explanation of those statements she found most compelling. For instance, Vialpando testified that she found the amount of detail Victim used in describing the assault to be compelling:

> She told me . . . first of all, that it's on Thanksgiving. . . . The detail—that they needed the hose for the compressor—why would she come up with something like that? She went to the garage, she walked in, she saw [Defendant]. . . . He grabbed the hose, she tried to run out, . . . he grabbed [her] hard by the arm. She doesn't just say he grabbed me or he threw me. [She said,] "He grabbed me hard by my arm and threw me on the floor." He told [her], "Let's make babies." She heard this. This person didn't say, "I'm going to rape you" or "just lie there," he said, "let's make babies." [S]he says he was holding her down and tried to take his pants off too. You can almost see what this child is talking about. . . . I can almost see that whole thing where the child is being held down with one hand and the pants are being taken off with the other hand. . . . That's very detailed. . . . She knows what was happening with each of the hands. It's very detailed. Unless you've experienced it, you would not know.

## 2.      Plain Error Review

**{10}**      We review for plain error in cases raising evidentiary matters in which the asserted error "affected substantial rights," though they were not brought to the attention of the trial judge. *See State v. Lucero*, 1993-NMSC-064, ¶ 13, 116 N.M. 450, 863 P.2d

1071 (noting that "the very point of the rule is to permit review of grave errors in the admission of evidence which have *not* been the subject of a ruling by the trial court because no objection was made at trial" (internal quotation marks and citation omitted)). The plain error rule is to be used sparingly as an exception to a preservation rule designed to encourage efficiency and fairness. *State v. Paiz*, 1999-NMCA-104, ¶ 28, 127 N.M. 776, 987 P.2d 1163. "To find plain error, [we] must be convinced that admission of the testimony constituted an injustice that created grave doubts concerning the validity of the verdict. Further, in determining whether there has been plain error, we must examine the alleged errors in the context of the testimony as a whole." *State v. Montoya*, 2015-NMSC-010, ¶ 46, 345 P.3d 1056 (alternation, omission, internal quotation marks, and citations omitted).

**{11}**  Our Supreme Court has addressed the applicability of the plain error doctrine to the admission of expert testimony bearing directly on the credibility of an accuser in *Lucero*. The expert witness in *Lucero*, a clinical psychologist, recounted statements regarding sexual abuse the accuser made during the evaluation, testified that the accuser had been molested, stated that the defendant was the molester, and opined that the complainant's statements were truthful. 1993-NMSC-064, ¶¶ 5-6, 21. The *Lucero* Court concluded that the expert's testimony commenting directly upon the credibility of the accuser was "extremely prejudicial[,]" stating that while "testimony may be offered to show that the victim suffers from symptoms that are consistent with sexual abuse, it may not be offered to establish that the alleged victim is telling the truth[.]" *Id.* ¶ 15 (internal quotation marks and citation omitted). Concluding that the expert's testimony "naming the perpetrator was tantamount to saying that the complainant was telling the truth[,]" the *Lucero* Court found the expert's testimony that the accuser's symptoms were caused by sexual abuse impermissible, as such testimony "vouches too much for the credibility of the victim and encroaches too far upon the province of the jury to determine the truthfulness of the witnesses." *Id.* ¶¶ 16-18 (internal quotation marks and citation omitted) (noting that "to allow an expert to testify that the complainant's symptoms were in fact caused by sex abuse is tantamount to allowing the expert to indirectly validate the complainant's credibility, and that is improper"). Turning its attention to the impact that the expert's testimony had on the trial itself, our Supreme Court concluded that the prejudicial effect outweighed any probative value that it might have: "Even though possibly admissible, . . . allowing the expert during direct examination to repeat to the jury the [accuser's] statements, made to the expert during her evaluation, is too prejudicial because it amounts to an indirect comment on the alleged victim's credibility." *Id.* ¶ 19. The admission of the expert's testimony therefore amounted to plain error. *See id.* ¶ 18 ("Determining the complainant's credibility or truthfulness is not a function for an expert in a trial setting, but rather is an issue reserved for the jury."). Finally, because the expert "repeated so many of the complainant's statements regarding the alleged sexual abuse by the defendant and because [the expert] commented directly and indirectly upon the complainant's truthfulness," the *Lucero* Court expressed "grave doubts concerning the validity of the verdict and the fairness of the trial" and concluded that the admission of the expert testimony was not harmless error. *Id.* ¶ 22.

**{12}** Like the expert in *Lucero*, Vialpando repeatedly commented, both directly and indirectly, upon Victim's truthfulness, identified Defendant as Victim's molester numerous times based solely on Victim's statement of events, and repeated in detail Victim's statements regarding the sexual abuse. We conclude *Lucero* applies to this case, and the admission of the expert testimony was in error.

### 3. Acquiescence

**{13}** The State acknowledges the applicability of *Lucero* to this case, and concedes that the admission of Vialpando's now-challenged testimony on redirect was improper and resulted in error. Nonetheless, the State, relying on *State v. Hill*, 2008-NMCA-117, 144 N.M. 775, 192 P.3d 770, argues that the doctrine of plain error should not apply to this case because Defendant acquiesced in the admission of Vialpando's testimony by cross-examining the witness.

**{14}** In *Hill*, the defendant objected to a single statement made by a lay witness, who testified about nationwide reporting of sexually transmitted diseases. *Id.* ¶ 22. For the first time on appeal, the defendant argued that the witness "exceeded her personal knowledge of the subject matter and, because the [s]tate did not qualify her as an expert, [the testimony] was improperly admitted." *Id.* ¶ 20. Assuming without deciding that the statement was improperly admitted, this Court found that the doctrine of plain error did not apply because "[the d]efendant, instead of objecting to [the witness's] testimony on that ground, chose to cross-examine her on the topic." *Id.* ¶ 22. Under the facts of that case, the Court concluded such a choice constituted waiver of any review of the propriety of the statement on appeal. *Id.*

**{15}** The State asks us to extend *Hill*'s reach to the present case—where numerous, impermissible statements were elicited by the State during both direct examination and redirect examination—thereby barring plain error review because Defendant exercised his right to cross-examine Vialpando. We decline to do so. Initially, we note that *Hill*'s limitation of the plain error doctrine has never been cited in a published opinion in the eleven years since *Hill*, nor has it been extended beyond the facts of that case. Moreover, nothing in *Hill*'s limited rationale suggests that it should apply in cases such as this, where the State repeatedly elicited prejudicial testimony that amounts to plain error under *Lucero*. Indeed, as *Lucero* aptly observed: "The fact that trial counsel did not preserve these errors for appeal by lodging a proper objection does not avoid review of the issue as plain error." 1993-NMSC-064, ¶ 21. Furthermore, the State's reading of *Hill* would inexplicably pit a defendant's right to cross-examination against his ability to have harmful evidentiary matters reviewed under the plain error rule. *See generally State v. Lopez*, 1996-NMCA-101, ¶ 14, 122 N.M. 459, 926 P.2d 784 ("The right to cross-examination is viewed as the most important element of the right of confrontation. [It] . . . is the principal means for testing the truth and credibility of a witness and is considered critical to insure the integrity of the fact-finding process." (internal quotation marks and citations omitted)). For these reasons, we decline to extend the rationale of *Hill* to this case and instead exercise our discretion to review Vialpando's testimony for plain error. *See* Rule 12-321(B)(2)(b) NMRA (permitting the appellate court in its

discretion to review issues involving plain error). Having already concluded that the admission of Vialpando's testimony was error, we examine whether the error was harmless.

## 4.     Harmless Error

**{16}**     Alternatively, the State contends that any error was not harmful to the defense, pointing to the fact that Defendant was not convicted of CSPM and arguing "it is [therefore] not likely that the jury was swayed by inadmissible testimony." (Emphasis omitted.) The State's argument is based on pure conjecture as to the meaning of the jury's verdicts. The only witnesses to the alleged events were Victim, Defendant, and Defendant's son and there was no physical evidence of sexual assault; and as such, witness credibility was a pivotal issue in this case. Given the importance of credibility in the trial, we have grave doubts concerning the fairness of the trial and conclude that the admission of Vialpando's testimony amounted to plain error that was not harmless. *See Lucero*, 1993-NMSC-064, ¶ 22; *see also Montoya*, 2015-NMSC-010, ¶ 46.

**{17}**     Defendant is entitled to reversal of his convictions based on the plain error committed in his trial. Whether the proper remedy is dismissal of the charges or retrial upon remand, however, is dependent on the legal sufficiency of the State's evidence in support of Defendant's convictions at the first trial. *See State v. Consaul*, 2014-NMSC-030, ¶ 41, 332 P.3d 850 ("To avoid any double jeopardy concerns, we review the evidence presented at the first trial to determine whether it was sufficient to warrant a second trial."); *State v. Cabezuela*, 2011-NMSC-041, ¶ 40, 150 N.M. 654, 265 P.3d 705 ("If we find that sufficient evidence was presented at trial to support a conviction, then retrial is not barred." (internal quotation marks and citation omitted)). We therefore consider whether each of Defendant's convictions is supported by sufficient evidence.

## B.     Sufficiency of the Evidence and Double Jeopardy

**{18}**     An appellate court evaluating whether there was sufficient evidence to support a conviction "must consider all the evidence admitted by the trial court." *State v. Post*, 1989-NMCA-090, ¶ 22, 109 N.M. 177, 783 P.2d 487 (adopting reasoning set forth in *Lockhart v. Nelson*, 488 U.S. 33 (1988)). "If all of the evidence, including the wrongfully admitted evidence, is sufficient, then retrial following appeal is not barred." *Post*, 1989-NMCA-090, ¶¶ 22-23. Appellate courts look to "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (internal quotation marks and citation omitted). "[S]ubstantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *State v. Salgado*, 1999-NMSC-008, ¶ 25, 126 N.M. 691, 974 P.2d 661 (internal quotation marks and citation omitted). We conduct this evaluation using the instructions given to the jury at trial, *State v. Ramos*, 2013-NMSC-031, ¶ 30, 305 P.3d 921, and "view the evidence in the light most favorable to the [s]tate, resolving all conflicts and making all permissible inferences in favor of the jury's verdict." *Consaul*, 2014-NMSC-030, ¶ 42 (internal quotation marks

and citation omitted). "It is our duty to determine whether any rational jury could have found the essential facts to establish each element of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted).

## 1.    Kidnapping

**{19}**    Defendant argues that the evidence of force underlying his conviction for kidnapping (Count IV) was merely incidental to that presented in support of his alleged CSPM, and that the evidence was therefore insufficient to support his conviction for kidnapping. "Kidnapping" is defined as "the unlawful taking, restraining, transporting or confining of a person, by force" with the intent to inflict a sexual offense on the victim. NMSA Section 1978, § 30-4-1(A)(4) (2003). In enacting our kidnapping statute, "the Legislature did not intend to punish as kidnapping restraints that are merely incidental to another crime." *State v. Trujillo*, 2012-NMCA-112, ¶ 39, 289 P.3d 238. Deciding whether the conduct giving rise to a kidnapping charge is incidental to the conduct leading to another charge requires we consider "whether the restraint or movement increases the culpability of the defendant over and above his culpability for the other crime." *Id.* ¶ 38. This inquiry includes consideration of whether the restraint was longer or greater than necessary to commit the other crime, whether the restraint decreased the defendant's risk of detection or the difficulty associated with committing the crime, and whether the restraint increased the risk of harm or the severity of the assault beyond that inherent to the underlying crime. *Id.* ¶¶ 34, 36, 37, 39; *see also State v. Tapia*, 2015-NMCA-048, ¶ 31, 347 P.3d 738.

**{20}**    According to Victim, she encountered Defendant in an outdoor shed and, upon seeing him, tried to retreat through the shed's open door. Before she could do so, however, Defendant stopped her retreat by grabbing her by the arm, suggesting that they "make babies," and shutting the door to the shed before throwing her to the floor and sexually assaulting her. Based on this evidence, Victim's confinement in the shed was slightly longer than necessary to commit the sexual assault, as Defendant took time to close the shed door and utter a menacing statement to Victim. Defendant's act of closing the door served, among other purposes, to decrease his risk of detection. While it is less clear whether Defendant increased the severity of the assault when he grabbed Victim's arm or closed the door to the shed, the failure to satisfy this condition, alone, does not necessarily lead to a conclusion that Defendant's conduct was incidental to the sexual assault.

**{21}**    Our analysis is intended to encompass the totality of circumstances. *Tapia*, 2015-NMCA-048, ¶ 29. In conducting this analysis, we find it particularly relevant that Victim was attempting to retreat from the shed when Defendant grabbed her and that, through his actions, Defendant prevented her escape. And although some degree of privacy is often sought in incidents of sexual assault, the shed's closed door served a dual purpose—preventing detection and preventing Victim's escape. Victim's association with Defendant was no longer voluntary when Defendant grabbed her. *See State v. Jacobs*, 2000-NMSC-026, ¶ 24, 129 N.M. 448, 10 P.3d 127 ("[T]he key to finding the restraint element in kidnapping, separate from that involved in criminal sexual

penetration, is to determine the point at which the physical association between the defendant and the victim was no longer voluntary."). Though we are cognizant of the short time period between Defendant's initial acts and the sexual assault, as well as the confined space in which they occurred, Defendant's actions constituted a completed kidnapping upon preventing Victim's escape, regardless of the sexual assault that followed. *See id.* ¶ 25 (concluding kidnapping was complete before the act of attempted criminal sexual penetration began); *State v. McGuire*, 1990-NMSC-067, ¶ 10, 110 N.M. 304, 795 P.2d 996 ("Once [the] defendant restrained the victim with the requisite intent to hold her for service against her will, he had committed the crime of kidnapping, although the kidnapping continued through the course of [the] defendant's other crimes."); *but see Tapia*, 2015-NMCA-048, ¶ 34 ("[W]hen in the course of committing a crime, a defendant does no more than move the victim around inside the premises in which the victim is already found, the movement generally will not be determined to constitute kidnapping." (alteration, internal quotation marks, and citation omitted)).

**{22}** Defendant argues that his actions are, as a matter of law, incidental to the underlying sexual assault. As support, Defendant cites to both *Trujillo* and *Tapia*, in which we conducted case-specific analyses and concluded as a matter of law that the kidnapping statute was not intended to encompass the restraints and movements described by the testimony in those cases. *Tapia*, 2015-NMCA-048, ¶¶ 29, 30, 36; *Trujillo*, 2012-NMCA-112, ¶¶ 6, 42. In *Trujillo*, "a momentary grab in the middle of a fight" was insufficient as a matter of law to support a kidnapping conviction. 2012-NMCA-112, ¶ 6. In *Tapia*, a "lack of complexity in the movements and restraints described" caused this Court to conclude that the actions giving rise to the kidnapping conviction—lying on top of the victim during a sexual assault, getting on the bed to commit a sexual assault, making the victim remove clothing, and causing the victim to go to another room in the home—were incidental to the sexual assaults and, as a matter of law, could not support kidnapping convictions. 2015-NMCA-048, ¶¶ 30-32, 36.

**{23}** This case, unlike *Trujillo* and *Tapia*, presents a more nuanced set of facts in which Defendant not only restrained Victim during the sexual assault, but also thwarted her attempt to escape. *See Trujillo*, 2012-NMCA-112, ¶ 42 (noting that a "more complicated factual scenario" presents a fact-specific inquiry for the jury as to whether a restraint is incidental to another crime). The jury was instructed that the State had to prove that Defendant "restrained or confined [Victim] by force[,]" and that Defendant "intended to hold [Victim] against her will to commit a sexual offense" against her. Drawing upon and distinguishing our holding in *Trujillo*, we conclude that there is sufficient evidence of restraint and confinement, independent from the restraint used during the sexual assault, to support Defendant's kidnapping conviction.

## 2.     Conspiracy

**{24}** The jury found Defendant guilty of four counts of conspiracy: conspiracy to commit CSPM (Count II), conspiracy to commit kidnapping (Count V), conspiracy to commit intimidation or threatening a witness (Count X), and conspiracy to commit bribery of a witness (Count XI). Defendant challenges the sufficiency of the evidence

supporting the latter three conspiracy convictions, arguing that those convictions also violate double jeopardy, and asks that we vacate all conspiracy convictions except the conviction for conspiracy to commit CSPM. The State argues that the evidence is sufficient to support each conspiracy conviction, but concedes that double jeopardy requires that we vacate Defendant's convictions for conspiracy to commit kidnapping and conspiracy to commit bribery of a witness. We begin by considering the State's concessions, then address Defendant's argument, and conclude with a sufficiency analysis of the sole remaining conspiracy conviction.

**{25}**  Both parties point to *Gallegos*, 2011-NMSC-027, 149 N.M. 704, 254 P.3d 655, as the authority controlling Defendant's double jeopardy claims. In *Gallegos*, our Supreme Court sought to clarify the standard applied in cases containing multiple conspiracy convictions by acknowledging that such an analysis "inevitably presents a double jeopardy question" that, once answered, is then subject to the deferential review afforded in a substantial evidence review. *Id.* ¶¶ 28-29, 43, 50; *see State v. Rodriguez*, 2006-NMSC-018, ¶ 3, 139 N.M. 450, 134 P.3d 737 (recognizing that appellate courts review double jeopardy claims de novo). In beginning its double jeopardy analysis, the *Gallegos* Court relied on the language of the conspiracy statute to reject a definition of conspiracy "that focuses on the criminal objectives of the agreement, i.e., the individual crimes that each combination or agreement sets out to accomplish." 2011-NMSC-027, ¶¶ 51-52 (applying unit of prosecution principles). The Court concluded that by enacting the conspiracy statute, the Legislature created "a rebuttable presumption that multiple crimes are the object of only one, overarching, conspiratorial agreement subject to one, severe punishment." *Id.* ¶ 55. Designating this standard as a "presumption of singularity," the Court explained that the state could overcome this presumption only in "exceptional instances[,]" as "doing so requires the state to carry a heavy burden." *Id.* ¶¶ 55-56. To aid courts in assessing whether the state has met its burden in rebutting the presumption of singularity, *Gallegos* adopted a totality of the circumstances test, which includes consideration of the following factors: the location of the alleged conspiracies, the temporal overlap between the conspiracies, the overlap of personnel between the conspiracies, the overt acts charged, and the role played by the defendant. *See id.* ¶ 42 (taking note of related questions, including "whether there was a common goal among conspirators[,]" "whether the agreement contemplated bringing to pass a continuous result[,]" and "the extent to which the participants overlap in the various dealings" (internal quotation marks and citation omitted)).

**{26}**  Defendant's conviction for conspiracy to commit intimidation or threatening of a witness (Count X) is based on testimony that, just before releasing Victim and in the presence of Defendant's son, Defendant threatened Victim not to tell anyone what had happened. The State then offered testimony that Defendant's son called her later that night and repeated the threat as the basis for the other conspiracy to commit bribery of a witness charge (Count XI). As the State concedes, the conduct that gave rise to the conspiracy to commit bribery of a witness (Count XI), which occurred later on the same day, was likely the result of the then-recent prior agreement. That Defendant's son decided to call Victim and reiterate Defendant's threats regarding secrecy was not tantamount to forming an additional agreement to ensure Victim's silence. *See id.* ¶ 63.

The State therefore proffered no evidence to rebut the presumption that the two separate threats, uttered to the same victim on the same day, were the result of only one, overarching conspiratorial agreement. *Id.* ¶ 55. As such, we accept the State's concession that Defendant's conviction for conspiracy to commit bribery of a witness (Count XI) must be vacated.

**{27}** In order to prove conspiracy to commit CSPM and conspiracy to commit kidnapping, the State relied on testimony that Defendant continued restraining Victim after he sexually assaulted her so that Defendant's son could also sexually assault her. Both of these conspiracy convictions involved the same victim and the same perpetrators, and occurred in the same location during the same time period, without any intervening events. Furthermore, the role Defendant played during the encounter is virtually the same for each conspiracy count. Again, the State did not present any evidence to overcome the presumption of singularity, and we therefore agree that Defendant's conviction for conspiring to commit kidnapping must be vacated.

**{28}** Applying *Gallegos* to the remaining conspiracy convictions—conspiracy to commit CSPM and conspiracy to commit bribery of a witness—we again consider whether the State provided sufficient proof to rebut the presumption that Defendant entered into only one agreement, thereby taking part in only one conspiracy. *See id.* ¶ 55. We conclude that it has not. The State seeks to distinguish between the purposes of conspiracy to commit CSPM and conspiracy to commit bribery of a witness by arguing that the latter conspiracy in no way furthered the sexual attack that gave rise to the former conspiracy. This distinction is contrary to the reasoning set forth in *Gallegos*: "That the same agreement evolved over time to embrace a . . . new objective . . . did not create a new crime but simply added a new objective to the same criminal combination." *Id.* ¶ 62; *see* NMSA 1978, § 30-28-2(A) (1979) ("Conspiracy consists of knowingly combining with another for the purpose of committing a felony."). The actions of Defendant and Defendant's son were aimed at furthering a single goal or purpose—facilitating the commission of CSPM upon Victim. Agreeing to silence the victim of their previously agreed-upon crime does not create a new agreement, but rather is one aspect of "a larger continuous combination." *Gallegos*, 2011-NMSC-027, ¶ 62. In addition, we find it noteworthy that the State repeatedly defined conspiracy in terms of actions rather than agreements in its closing arguments to the jury. *Gallegos* explicitly rejected such an approach. *See id.* ¶ 52.

**{29}** Under the facts of this case, Defendant's convictions for multiple conspiracies violate his double jeopardy rights. Based on *Gallegos* and the reasoning set forth above, we accept the State's concession that Defendant's convictions for conspiracy to commit kidnapping and conspiracy to threaten or intimidate a witness must be vacated. We also vacate Defendant's other conviction for conspiracy to commit bribery of a witness. *See State v. Montoya*, 2013-NMSC-020, ¶ 55, 306 P.3d 426 (stating rule requiring, "where one of two otherwise valid convictions must be vacated to avoid violation of double jeopardy protections, we must vacate the conviction carrying the shorter sentence"); *see also* § 30-28-2 (making conspiracy to commit a first-degree felony a second-degree felony, and making a conspiracy to commit a third-degree

felony a fourth-degree felony); *compare* NMSA 1978, § 30-24-3(C) (1997) (defining bribery or intimidation of a witness as a third-degree felony), *with* NMSA 1978, § 30-9-11 (2003, amended 2009) (making first-degree criminal sexual penetration, which includes criminal sexual penetration of a minor under 13 years of age, a first-degree felony).

**{30}** Regarding the sole remaining conspiracy conviction, the jury was instructed that the State was required to prove beyond a reasonable doubt that Defendant "and another person by words or acts agreed together to commit [CSPM]" and that they intended to commit CSPM. The jury could reasonably conclude that a tacit agreement existed between Defendant and Defendant's son based on testimony that Defendant and Defendant's son acted in concert to sexually assault Victim. *See Gallegos*, 2011-NMSC-027, ¶¶ 42, 45 (acknowledging rule that jury may "infer the existence of an agreement based on the defendant's conduct and surrounding circumstances"). Furthermore, the jury could reasonably conclude that Defendant intended to conspire to commit CSPM based on Victim's testimony that Defendant restrained Victim by pinning her to the floor, with her arms above her head and her legs under his so that Defendant's son could sexually assault her. *See generally State v. Silva*, 2008-NMSC-051, ¶ 18, 144 N.M. 815, 192 P.3d 1192 (acknowledging that specific intent, such as that required for tampering, "is subjective and is almost always inferred from other facts in the case" or "inferred from an overt act of the defendant" (internal quotation marks and citations omitted)). We therefore conclude that the evidence is sufficient to support Defendant's conviction for conspiracy to commit CSPM.

### 3. Intimidation or Threatening of a Witness (Count VIII)

**{31}** Defendant argues that the State presented insufficient evidence to support his conviction for intimidation or threatening of a witness (Count VIII). The State did not respond to Defendant's argument. In support of this count, the State relied on testimony elicited from Victim that Defendant's son called her on the telephone after the incident in the shed and threatened her, stating, "[r]emember, if you say anything, I'll get you at school myself." The jury was instructed that in order to find Defendant guilty, it must find that the State proved beyond a reasonable doubt that Victim was "a person likely to become a witness in a judicial proceeding" and that Defendant "knowingly intimidated or threatened [Victim] for the purpose of preventing [her] from testifying to any fact in a judicial proceeding." UJI 14-2402; *see* § 30-24-3. The jury was also instructed that it could find Defendant guilty "even though he himself did not do the acts constituting the crime" if the State proved beyond a reasonable doubt that he "helped, encouraged or caused the crime to be committed." *See State v. Carrasco*, 1997-NMSC-047, ¶ 6, 124 N.M. 64, 946 P.2d 1075 ("A person who aids or abets in the commission of a crime is equally culpable as the principal. Aiding and abetting is not a distinct offense and it carries the same punishment as a principal." (citations omitted)).

**{32}** The State did not present any evidence that Defendant helped or encouraged Defendant's son to intimidate or threaten Victim, nor did it establish that Defendant requested that Defendant's son place the call to Victim or was even aware that

Defendant's son had called Victim. In fact, nothing in the record suggests Defendant had any involvement in placing the call. Based on this evidence, the jury could not have reasonably concluded that Defendant acted in any way to help or encourage Defendant's son to place the phone call to Victim. We therefore conclude that, even viewing the evidence in the light most favorable to the State, the evidence is not sufficient to support Defendant's conviction for intimidation or threatening of a witness (Count VIII).

### 4.    Bribery of a Witness (Count IX)

**{33}**    The jury was instructed that, in order to find Defendant guilty of bribery of a witness (Count IX), the State had to prove beyond a reasonable doubt that Defendant "knowingly intimidated or threatened [Victim]," that Defendant "intended to keep [Victim] from truthfully reporting to a law enforcement officer or any agency of government . . . information relating to the commission of the felony of criminal sexual penetration[.]" UJI 14-2403; *see* § 30-24-3. Victim testified that after the assault, Defendant threw her pants at her, instructed her to put them on, and stated, "remember, if you say anything, I'll get you again." This evidence, viewed in the light most favorable to the State, is sufficient to support Defendant's conviction for bribery of a witness (Count IX).

### 5.    Contributing to the Delinquency of a Minor

**{34}**    The jury was instructed that, in order to find Defendant guilty of contributing to the delinquency of a minor (Count VI), the State had to prove beyond a reasonable doubt that Defendant "caused or encouraged [Defendant's son] to engage in fellatio with [Victim]," that doing so "caused or encouraged the delinquency of [Defendant's son]," and that Defendant's son was under the age of eighteen at the time. UJI 14-601; *see* NMSA 1978 § 30-6-3 (1990). Victim testified that Defendant pinned her to the floor, with her arms above her head and her legs under his, while Defendant's son sat on her chest and sexually assaulted her by putting his penis in her mouth. Victim also testified that at the time of trial, Defendant's son was approximately fourteen years old. This evidence, taken in the light most favorable to the verdict, is sufficient to support Defendant's conviction for contributing to the delinquency of a minor.

### 6.    Battery Against a Household Member

**{35}**    The jury was instructed that, in order to find Defendant guilty of battery against a household member (Count VII), the State had to prove beyond a reasonable doubt that Defendant "intentionally touched or applied force" to Victim in a "rude, insolent or angry manner" and that Victim was a household member. UJI 14-390; *see* NMSA 1978, 30-3-15(A) (2001, amended 2008). Victim testified that Defendant kicked and pushed her. Victim also testified that Defendant is her uncle, and Victim's father testified that Defendant is his brother. Taken in the light most favorable to the State, this evidence is sufficient to support Defendant's conviction for battery against a household member.

### 7.    Child Abuse

**{36}** The jury was instructed that to convict Defendant of child abuse (Count XII), the State had to prove beyond a reasonable doubt that: (1) "[Defendant] intentionally and without justification caused [Victim] to be placed in a situation which endangered the life or health of [Victim,]" and (2) "[Defendant] acted intentionally or with reckless disregard and without justification." UJI 14-615; *see* NMSA 1978, § 30-6-1(D) (2001, amended 2009). The jury was instructed that in order to find reckless disregard, it had to find that "[Defendant] knew or should have known [that his] conduct created a substantial and foreseeable risk, . . . disregarded that risk[,] and . . . was wholly indifferent to the consequences of the conduct and to the welfare and safety of [Victim.]" UJI 14-615; *see* § 30-6-1(A)(3). The jury was also instructed that the State had to prove that Victim was under the age of eighteen when these events occurred.

**{37}** According to Victim's testimony, Defendant grabbed her forcefully by the arm, threw her onto the ground, and pushed and kicked her when she stood up. When she testified at trial in 2005, Victim was fourteen years old, and she testified that these events occurred in Algodones, New Mexico on Thanksgiving Day in 2003. Victim's testimony, taken in the light most favorable to the State, is sufficient to support Defendant's conviction for child abuse.

**C.    Speedy Trial**

**{38}** Turning to Defendant's speedy trial claim based on the delay in bringing his case to trial, we agree with the State's contention that Defendant failed to preserve the issue for appeal. "It is well-settled law that in order to preserve a speedy trial argument for appellate review, the defendant must properly raise it in the lower court and invoke a ruling." *State v. Olivas*, 2011-NMCA-030, ¶ 22, 149 N.M. 498, 252 P.3d 722 (alterations, internal quotation marks, and citation omitted). Though Defendant asserted his speedy trial right when his case began in 2003, he never filed a motion to dismiss for violation of his speedy trial rights, and he never sought to invoke a ruling from the district court on that issue. We therefore conclude that the issue of whether the State violated his right to a speedy trial was not preserved. *See Olivas*, 2011-NMCA-030, ¶ 22; *see also State v. Rojo*, 1999-NMSC-001, ¶¶ 49-53, 126 N.M. 438, 971 P.2d 829 (concluding that constitutional speedy trial issue was not preserved where the defendant did not specifically invoke a ruling on the issue and the district court had no occasion to weigh any of the four factors established in *Barker v. Wingo*, 407 U.S. 514, 530-32 (1972)). While unpreserved speedy trial claims can be reviewed for fundamental error at the appellate court's discretion, Defendant has not asked us to review for fundamental error, and we decline to exercise our discretion in this case. *See State v. Lucero*, 1999-NMCA-102, ¶ 45 127 N.M. 672, 986 P.2d 468 (declining to review a claim that the district court improperly commented on the evidence where the issue was not preserved and the defendant did not argue fundamental error on appeal); *see also State v. Siqueiros-Valenzuela*, 2017-NMCA-074, ¶ 8, 404 P.3d 782, (refusing to address arguments that were not made in the district court and no assertion of fundamental error was made on appeal), *cert. denied* ___-NMCERT-___ (No. S-1-SC-36486, July 6, 2017).

## D.     Due Process and Appellate Delay

**{39}**     Defendant argues that the approximately ten-year period between this Court's dismissal of his appeal and the subsequent reinstatement of the appeal constituted a violation of his right to due process sufficient to warrant reversal of his convictions and dismissal of the indictment. Whether inordinate appellate delay violates a criminal defendant's right to due process is an issue of first impression for our appellate courts.

**{40}**     In New Mexico, a defendant's right to appeal is established by Article VI, Section 2 of the New Mexico Constitution. The United States Supreme Court has made clear that where a state provides a right to appeal, "the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution."[2] *Evitts v. Lucey*, 469 U.S. 387, 393 (1985); *see State v. Ibarra*, 1993-NMCA-040, ¶ 7, 116 N.M. 486, 864 P.2d 302 (New Mexico courts have recognized that the Fourteenth Amendment compels the state to "provide a fair opportunity for criminal defendants to present their contentions within the context of those state procedures"). We now join the majority of jurisdictions in recognizing that due process protects a criminal defendant against inordinate delay in direct appeal proceedings.[3] *See, e.g.*, *United States v. Alston*, 412 A.2d 351, 359 (D.C. 1980) (holding that delay preventing a fair trial after reversal of a conviction implicates due process); *Lopez v. State*, 769 P.2d 1276, 1288-89 (Nev. 1989) (recognizing that "a defendant may be denied due process of law where there is an inordinate delay in the appeal process" resulting in prejudice to the defense); *State v. Hall*, 487 A.2d 166, 171 (Vt. 1984) (indicating that an excessive delay in the appellate process may violate due process upon a sufficient defense showing of prejudice); *see generally State v. Lopez*, 2018-NMCA-002, ¶ 12, 410 P.3d 226 (stating that due process serves "as a protection against exorbitant delays").

### 1.     Approaches to Analyzing Due Process

**{41}**     Although an "undue delay in processing an appeal *may* rise to the level of a due process violation," *State v. Hammonds*, 541 S.E.2d 166, 175 (N.C. Ct. App. 2000) (internal quotation marks and citation omitted), "not every delay in the appeal of a case, even an inordinate one, violates due process[,]" *State v. Crabtree*, 625 S.W.2d 670, 674 (Mo. Ct. App. 1981) (internal quotation marks and citation omitted). *See also United States v. DeLeon*, 444 F.3d 41, 56-57 (1st Cir. 2006) (noting that while "[e]xtreme delay. . . may amount to a due process violation, . . . mere delay, in and of itself" is insufficient to establish a violation (internal quotation marks and citations omitted)). In evaluating whether appellate delay rises to the level of a due process violation, courts have generally taken one of two approaches.

---

[2] Defendant makes no argument based on the Equal Protection Clause, and our opinion today does not address whether the Equal Protection Clause offers any protections beyond those encompassed in the Due Process Clause.
[3] Because neither party disputes that there was at least a nine-year and four-month delay, with Defendant arguing that he suffered "a decade of delay," between dismissal of the direct appeal and entry of the second notice of direct appeal, we assume without deciding that this is the relevant time period and that it constitutes an "appellate delay" for purposes of our due process analysis. For reasons discussed below, we need not determine whether the State is responsible for any portion of this delay.

**{42}**   First, although the right at issue is grounded in the due process clause, many courts considering this issue have adopted a modified version of the United States Supreme Court's framework for analyzing alleged violations of a defendant's Sixth Amendment speedy trial rights as set out in *Barker*, 407 U.S. at 530 .[4] *See, e.g.*, *State v. Burton*, 269 P.3d 337, 343 (Wash. Ct. App. 2012) (stating that "[t]he *Barker* factors are relevant to the due process inquiry . . . , bearing in mind that we are analyzing [the defendant's] right to due process, not a right to a speedy appeal"). The stated rationale underpinning this approach is that the *Barker* speedy trial factors "are useful in conducting [the] due process analysis" required, as they provide a "familiar, thorough and practical means of assessing both the fairness and prejudice issues implicated by appellate delay." *Hoang*, 2014 CO 27 ¶ 48 (internal quotation marks and citation omitted); *see also Harris v. Champion*, 15 F.3d 1538, 1559 (10th Cir. 1994) (stating that the *Barker* balancing test "provides an appropriate framework for evaluating whether a defendant's due process right to a timely direct criminal appeal has been violated").

**{43}**   Other courts have declined to apply the *Barker* speedy trial factors and rejected any analogy between the Sixth Amendment speedy trial right and the Fifth Amendment due process right to a timely appeal, instead focusing on due process principles of fundamental fairness and prejudice.[5] The underlying reason these courts reject the *Barker* factors is that the considerations and consequences relevant to speedy trial by and large do not apply to appeals. This point was aptly explained in *Alston*:

> [A defendant's] conviction . . . can be said, in fairness, to rebut the
> presumption of innocence which underlies the right to bail, and, implicitly,

---

4Among the cases applying the *Barker* framework are *Isom v. State*, 497 So. 2d 208, 213 (Ala. Crim. App. 1986) (delay caused by preparation of trial transcript); *In re Christopher S.*, 13 Cal.Rptr.2d 215, 217 (Ct. App. 1992) (delay caused by neglect of state official); *Hoang v. People*, 2014 CO 27, ¶ 48, 323 P.3d 780 (delay in completion of the record on appeal); *Gaines v. Manson*, 481 A.2d 1084, 1095 (Conn. 1984) ("institutionally engendered appellate delays"); *Chatman v. Mancill*, 626 S.E.2d 102, 107-08 (Ga. 2006) (delay attributed to ineffective assistance of appellate counsel); *People v. Sistrunk*, 630 N.E.2d 1213, 1218, 1223 (Ill. App. Ct. 1994) (delay caused by failure to file either a record or briefs in appellate court and subsequent miscommunication between court system and the defendant); *State v. Bussart-Savaloja*, 198 P.3d 163, 167 (Kan. Ct. App. 2008) (delay caused by reasons not evident in appellate record); *State v. Connors*, 679 A.2d 1072, 1075 (Me. 1996) (delay caused by preparation of trial transcript); *Lanier*, 684 So. 2d at 94, 98 (delay resulting from three successive retrials and appeals); *Crabtree*, 625 S.W.2d at 674 (Mo. Ct. App. 1981) (delay caused by the preparation of trial transcripts); *State v. LeFurge*, 535 A.2d 1015, 1018-19 (N.J. Super. Ct. App. Div. 1988) (delay caused by defendant's dilatory filing practices); *State v. Lennon*, 976 P.2d 121, 124 (Wash. Ct. App. 1999) (delay caused by preparation of trial transcript); *Daniel v. State*, 78 P.3d 205, ¶¶ 9, 44 (Wyo. 2003) (delay caused by preparation of trial transcript).

5*See, e.g., Alston*, 412 A.2d at 356-57 (concluding that "Sixth Amendment does not apply to post-conviction appellate delay"); *DeLeon*, 444 F.3d at 58 (rejecting any "direct analogy made to tests involving the Sixth Amendment speedy trial right"); *Lopez*, 769 P.2d at 1289 (reasoning that "[t]he purposes of the Sixth Amendment . . . do not apply in the context of an appellate proceeding where the accused has already been convicted of an offense" (internal quotation marks and citation omitted)); *State v. Walker*, 667 A.2d 1242, 1246 (R.I. 1995) (declining to apply *Barker* test and expand the applicability of a speedy trial right to delay appellate proceedings); *State v. Lagerquist*, 176 S.E.2d at 141-42 (S.C. 1970) (concluding "the right to a speedy and public trial . . . does not include an [a]ppeal"); *cf. State v. Adkins*, 725 S.W.2d 660, 664 (Tenn. 1987) (concluding speedy trial is inapplicable where accused has already been convicted, but declining to weigh in on whether delay can give rise to a due process claim).

underlies the right to a speedy trial. Thus, in a fundamental sense absent pretrial delay the conviction and sentencing have satisfied the interests of the defendant, as well as the public, in a speedy trial, and the burden of persuasion on appeal has shifted from the state to the defendant. The variety of concerns of a defendant who has been accused but never brought to trial has been dispelled in the case of a defendant who has had the opportunity to stand trial. Thus, judicial consideration of the appeal period does not require the kind of emphasis on delay as such that the Sixth Amendment imposes on the period between arrest and trial. It follows that, once again, there is one, predominant concern when a defendant faces appellate delay: prejudice to the ability to defend against the charge in the event of a second trial.

412 A.2d at 358-59; *see id.* at 357 (noting that Supreme Court has drawn a distinction between a "speedy" and a "fair" trial) (citing *United States v. Lovasco*, 431 U.S. 783 (1977)); *see also State v. Chapple*, 660 P.2d 1208, 1225-26 (Ariz. 1983) (in banc) (adopting approach in *Alston*); *State v. Black*, 798 P.2d 530, 535 (Mont. 1990) (looking to the line of cases originating with *Alston* in adopting approach to due process claims in appellate delay context). Those courts rejecting the application of the *Barker* framework instead look to due process principles of prejudice and fundamental fairness to determine whether a criminal defendant's due process rights have been violated by appellate delay, with the predominant concern being prejudice.[6] *See Hall*, 487 A.2d at 171 ("We agree with those courts which have established a showing of substantial prejudice by the defendant as the underlying criterion or standard.").

**{44}**　Defendant urges us to follow the first approach and analyze his due process rights using the *Barker* factors. We decline to do so and, instead, join those jurisdictions that evaluate a defendant's due process rights in the context of a delayed appeal based on considerations of fairness and prejudice. We find the reasoning of *Alston* and other similar cases persuasive and conclude that the Fifth Amendment right to due process and the Sixth Amendment right to a speedy trial are not sufficiently analogous to warrant application of the *Barker* framework to due process claims arising from appellate delay. Moreover, our approach here today is consistent with prior New Mexico case law addressing delay that falls outside the protections of the Sixth Amendment but within the Due Process Clause. *See, e.g., Lopez*, 2018-NMCA-002, ¶ 14 (adopting the *Lovasco*, 431 U.S. 783, due process framework in evaluating sentencing delay, looking

---

[6]*See, e.g., Alston*, 412 A.2d at 356-57 (stating that "from a due process perspective, the one, indispensable concern during an appeal period is prejudice, since the focus shifts from a 'speedy' to a 'fair' trial"); *see also Chapple*, 660 P.2d at 1225 (applying reasoning set forth in Alston); *see also DeLeon*, 444 F.3d at 57-58 (rejecting any "direct analogy made to tests involving the Sixth Amendment speedy trial right" in favor of a "threshold requirement" that the defendant make a showing that prejudice "render[s] the proceedings fundamentally unfair" (internal quotation marks and citation omitted)); *Black*, 798 P.2d at 535 (rejecting *Barker* factors and stating, "[p]rejudice to the defendant is the sole determining factor in assessing whether a defendant was given a fair and meaningful appeal"); *Lopez*, 769 P.2d at 1289 (reasoning that "[t]he purposes of the Sixth Amendment . . . do not apply in the context of an appellate proceeding where the accused has already been convicted of an offense" and looking instead to "due process questions of fairness and prejudice"); *Hall*, 487 A.2d at 171 (declining to adopt *Barker* test, instead requiring "a showing of substantial prejudice").

to the reasons for the delay and the prejudice the defendant has suffered as a result of the delay); *see also Gonzales v. State*, 1991-NMSC-015, ¶¶ 3, 6, 111 N.M. 363, 805 P.2d 630 (adopting a two-prong test requiring a defendant to prove prejudice and intentional delay by the state in cases involving preaccusation delay and citing with approval this Court's approach in distinguishing between due process and speedy trial analyses); *State v. Grissom*, 1987-NMCA-123, ¶¶ 53-55, 106 N.M. 555, 746 P.2d 661 (applying distinct analyses to the defendant's speedy trial and due process claims and requiring showing of "actual prejudice" under due process analysis); *see also Salandre v. State*, 1991-NMSC-016, ¶ 12 n.1, 111 N.M. 422, 806 P.2d 562 ("The due process guarantees examined in *Gonzales* are to be distinguished from the [S]ixth [A]mendment speedy trial rights discussed in this opinion."). Our due process cases, similar to the *Alston* line of cases, emphasize the importance of a showing of prejudice in establishing a due process violation. *Compare Alston*, 412 A.2d at 359 (noting that prejudice is the "predominant concern when a defendant faces appellate delay"), *with Lopez*, 2018-NMCA-002, ¶ 14 (stating that "proof of prejudice is generally a necessary but not a sufficient element of a due process claim" (alteration, internal quotation marks, and citations omitted)). We see no reason to deviate from our well-established approach in the due process realm.

**{45}** Finally, in adopting the appropriate due process standard in cases involving appellate delay, we are mindful of the need to provide courts with flexibility to fashion a remedy for violations of what has been recognized as a flexible right. *See State ex rel. Torrez v. Whitaker*, 2018-NMSC-005, ¶¶ 87, 91, 410 P.3d 201 (recognizing that due process is necessarily a "malleable principle which must be molded to the particular situation" and characterizing it as a right that "calls for such procedural protections as the particular situation demands" (internal quotation marks and citation omitted)). Adherence to the *Alston* line of cases promotes that goal, while allowing courts to best determine "whether the action complained of violates those fundamental conceptions of justice which lie at the base of civil and political institutions, and which define the community's sense of fair play and decency." *Lopez*, 2018-NMCA-002, ¶ 13 (internal quotation marks and citation omitted). "Because each case revolves around a unique set of facts, consideration of the facts and circumstances of each case must be evaluated to determine whether that particular defendant has been afforded a fair and meaningful appeal." *Black*, 798 P.2d at 535 (internal quotation marks and citation omitted); *see generally State v. Gonzales*, 1990-NMCA-040, ¶ 25, 110 N.M. 218, 794 P.2d 361 ("To accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case.") (internal quotation marks and citation omitted). Having articulated the governing due process standard, our next step is to examine the facts and circumstances of this case to determine whether the appellate delay resulted in a violation of Defendant's due process rights.

## 2. Defendant's Due Process Claim

**{46}** Utilizing the due process framework set out in the *Alston* line of cases, we consider whether Defendant's due process rights were violated when his appeal was

delayed as a result of his counsel's failure to file a brief in chief, resulting in the dismissal and eventual reinstatement of his appeal. In order to determine whether a given appellate delay violates due process, an appellate court "must (1) evaluate the impact of the appeal period on the appellant. If the impact has been prejudicial, the court shall (2) decide whether the relationship between (a) the nature and severity of the prejudice and (b) the government's alleged responsibility for it by delaying the appeal, warrants dismissal of the information or indictment under the Fifth Amendment." *Alston*, 412 A.2d at 359 (footnote omitted) (citing *Lovasco*, 431 U.S. at 789-90, among other authorities). Thus, we begin by addressing prejudice, the predominant concern of our due process analysis. There are two potential forms of prejudice that courts evaluating appellate delay commonly consider: (1) prejudice to a defendant's ability to assert his or her arguments on appeal, and (2) prejudice to a defendant's right to defend him or herself in the event of retrial or resentencing. *See Alston,* 412 A.2d at 359; *see also Chapple*, 660 P.2d at 1226; *Lagerquist*, 176 S.E.2d at 143.

**{47}** Defendant makes no claim that his ability to assert arguments on appeal has in any way been prejudiced, and, to the contrary, he has successfully advanced meritorious arguments in this appeal. *See Lagerquist*, 176 S.E.2d at 143 ("Although delayed, there is no showing that the appeal upon the merits cannot be just as effectively prosecuted now as earlier."). Further, Defendant has made no argument pertaining to his ability to defend himself on retrial. Instead, Defendant argues through counsel that he has experienced undue anxiety and oppressive incarceration. Assuming, without deciding, that these are appropriate considerations in our due process analysis, Defendant's argument is insufficient to establish prejudice. *See DeLeon*, 444 F.3d at 59 ("A defendant who has been convicted of a crime no longer enjoys a presumption of innocence, and so his incarceration pending appeal cannot itself be said to be 'oppressive.' " (internal quotation marks and citations omitted)); *Lopez*, 769 P.2d at 1289 ("[A] defendant's anxiety during post-conviction incarceration does not violate due process." (citing *Chapple*, 660 P.2d at 1226; *Alston*, 412 A.2d at 359)). "[T]he showing of prejudice must be based on concrete, practical considerations, rather than vague speculation unsupported by the facts." *Hall*, 487 A.2d at 171. "Mere anxiety concerning the outcome of the appeal, without more, is not sufficient." *Id.* Likewise, "an appellant must distinguish himself or herself from any other prisoner victorious on appeal in order to demonstrate that the extension of his or her incarceration through delay was so oppressive as to warrant the setting aside of an indictment." *United States v. Mohawk*, 20 F.3d 1480, 1486 (9th Cir. 1994). Assuming further that Defendant's claim of oppressive incarceration is strengthened by the fact that he has meritorious claims on appeal, that claim must nonetheless fail in the absence of any showing that "his incarceration [was] any more oppressive than that of any other prisoner who has succeeded on appeal." *Id.* (concluding that ten years of incarceration was not determinative of prejudice issue).

**{48}** Based on the record before us, we are unable to conclude that Defendant suffered prejudice from the delay of his appeal.[7] *See In re Ernesto M., Jr.*, 1996-NMCA-

---

[7]We note that Defendant received the remedy he was entitled to under the Sixth Amendment's right to effective assistance of counsel for appellate counsel's failure to perfect his original appeal. *See State v. Lope,* 2015-NMCA-

039, ¶ 10, 121 N.M. 562, 915 P.2d 318 (considering prejudice in the context of a habeas proceeding and noting "[a]n assertion of prejudice is not a showing of prejudice"); *People v. Cousart*, 444 N.E.2d 971, 975 (N.Y. 1982) ("This court cannot assume, without the benefit of a record compiled at . . . a hearing or at the retrial, that any prejudice did result."); *Mohawk*, 20 F.3d at 1486 (concluding that mere speculation as to prejudice carries no weight). We therefore need not undertake the remainder of the due process analysis to determine that Defendant is not entitled to dismissal of the entire indictment on due process grounds.

## 4. State Due Process

**{49}** Defendant argues that, should we conclude that the Federal Constitution does not provide for dismissal of the charges against him, then we should dismiss the charges against him "under Article II, [Sections] 13 and 18 of the New Mexico Constitution[.]" Our law is well-settled that any divergence under state Constitutional law from Federal Constitutional precedent must be for one of three reasons: the federal analysis is flawed, there are structural differences between state and federal government, or there are distinctive state characteristics. *State v. Gomez*, 1997-NMSC-006, ¶ 19, 122 N.M. 777, 932 P.2d 1.

**{50}** Defendant contends Article II, Sections 13 and 18 are structurally different from their federal counterparts because they express "a stronger interest in preventing oppressive incarceration pending appeal," citing to *Montoya v. Ulibarri*, 2007-NMSC-035, 142 N.M. 89, 163 P.3d 476. Defendant, however, overstates our Supreme Court's holding in *Montoya*. While *Montoya* acknowledged that the cruel and unusual punishment prohibition of Article II, Section 13 and the due process provisions of Article II, Section 18 of our State Constitution have been interpreted to provide some additional protection as compared to their federal counterparts, 2007-NMSC-035, ¶¶ 22-23, it did so in the limited context of a habeas petitioner's right to assert a claim of actual innocence. *See id.* ¶ 23("We conclude that the conviction, incarceration, or execution of an innocent person violates all notions of fundamental fairness implicit within the due process provision of our state Constitution. . . . [A] habeas petitioner must be permitted to assert a claim of actual innocence in his habeas petition"). Nothing in *Montoya* supports Defendant's assertion that structural differences between our State Constitution and the Federal Constitution reflect a heightened state interest in "preventing oppressive incarceration pending appeal" than that expressed under federal law. Nor does Defendant cite to any authority supporting the notion that a showing of prejudice, as articulated above and required under the federal analysis, is unnecessary

---

011, ¶ 9, 343 P.3d 186 (extending the conclusive presumption of ineffective assistance of counsel found in *State v. Duran*, 1986-NMCA-125, ¶¶ 4-6, 105 N.M. 231, 731 P.2d 374, to case where appeal was dismissed due to attorney's inaction and permitting appeal be reinstated); *State v. Robles*, No. 30,118, 2010 WL 4550921, at *1 (N.M. Ct. App. July 19, 2010) ("[B]ased on *Duran*, the remedy for ineffective assistance of counsel in perfecting an appeal is not reversal of the defendant's convictions, but allowing the appeal to go forward."). Whether Defendant is entitled to additional relief under the Due Process Clause for appellate delay when that delay was occasioned by ineffective assistance of appellate counsel is a question we need not resolve today as Defendant has failed to establish a due process violation.

under a state constitutional analysis. We therefore need not further address whether the New Mexico Constitution provides greater protections than its federal counterpart. *See State v. Vigil-Giron*, 2014-NMCA-069, ¶ 60, 327 P.3d 1129 ("[A]ppellate courts will not consider an issue if no authority is cited in support of the issue and that, given no cited authority, we assume no such authority exists."); *see also State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031 (explaining that appellate courts are under no obligation to review unclear or undeveloped arguments).

**{51}** Defendant additionally argues that federal law is flawed because it finds no distinction between one who prevails on appeal "despite unconstitutional delay" and one who prevails on appeal without such a delay. Defendant, however, has failed to develop this argument, and we will not do so on his behalf. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("We will not review unclear arguments, or guess at what a party's arguments might be." (alteration, internal quotation marks, and citation omitted)). We find no basis for the dismissal of the charges against Defendant under our State Constitution.

## 5.    Request for Remand

**{52}** As a final matter, we decline Defendant's request to remand this case to the district court for the purpose of allowing him to develop facts relevant to the issue of prejudice. We do not believe remand to be a prudent course in the circumstances of this case, particularly in view of the delay that has already occurred and Defendant's success in obtaining a retrial. We are not, however, indifferent to Defendant's unique position and the procedural peculiarities of this case that may have impacted his ability to develop a factual record as to prejudice. As such, our decision today should not be read to foreclose the possibility that Defendant—upon discovery, for example, of facts or circumstances impairing his ability to prepare a defense upon retrial—may advance a due process argument before the district court on remand.[8] *See, e.g.*, *United States v. Marion*, 404 U.S. 307, 326 (1971) (reversing dismissal of indictment based on preaccusation delay because actual prejudice had not been established, but recognizing that such prejudice may be demonstrated at trial); *Lanier v. State*, 684 So. 2d 93, 100 (Miss. 1996) ("On remand, since [the c]ourt has found other reversible error, [the defendant] shall be allowed to raise the issue that his ability to defend himself has been prejudiced."). At this juncture, however, Defendant is entitled only to the relief warranted by those arguments we have found persuasive—namely, reversal and dismissal with respect to the convictions we have identified and retrial on the remaining convictions. *See State ex rel. Mastrian v. Tahash*, 152 N.W.2d 786, 312-13 (Minn. 1967) ("[T]he remedy is in correction of the error. . . . What [the defendant] rightly seeks is adequate and effective appellate review upon the merits of his original conviction, and that he will now have.").

## CONCLUSION

---

8We emphasize that nothing in this opinion is intended to suggest or prescribe any potential remedy or remedies in the event a due process violation resulting in prejudice to Defendant is shown upon remand.

**{53}** We remand this matter to the district court with instructions to vacate Defendant's convictions for conspiracy to commit kidnapping (Count V), intimidation or threatening a witness (Count VIII), conspiracy to commit intimidation or threatening a witness (Count X), and conspiracy to commit bribery of a witness (Count XI), and to conduct further proceedings consistent with this opinion.

**{54}   IT IS SO ORDERED.**

**JULIE J. VARGAS, Judge**

**WE CONCUR:**

**M. MONICA ZAMORA, Chief Judge**

**JENNIFER L. ATTREP, Judge**